IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| TIMOTHY PEARCE, | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:23-cv-1251 (RDA/JFA) |
| | ) | |
| DARRELL MILLER, *et al.*, | ) | |
|     Defendants. | ) | |

## <u>**MEMORANDUM OPINION AND ORDER**</u>

Timothy Pearce ("Pearce" or "Plaintiff"), a former Virginia inmate, filed a *pro se* complaint pursuant to 42 U.S.C. § 1983 on September 12, 2023, alleging that his constitutional rights were violated while he was detained by the Virginia Department of Corrections ("VDOC"), at the Deerfield Correctional Center ("DCC") in Deerfield, Virginia. Dkt. No. 1. The matter is before the Court on Plaintiff's second amended complaint ("SAC"), which names six defendants—Chadwick Dotson, Jermiah Fitz Jr., Darrell Miller, J.D. Oates, Latesha Reid, and Cheala Washington. Dkt. No. 19 1-3. On October 15, 2024, Defendants DeBerry, Dotson, Fitz, Miller, Reid, and Washington filed a motion to dismiss with a supporting brief. Dkt. Nos. 27, 28. On November 25, 2024, Defendant Oates filed his motion to dismiss, with a supporting brief. Dkt. Nos. 35, 36. On December 4, 2024, Plaintiff was advised of his rights under *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975). Dkt. No. 39. Plaintiff responded to the motions to dismiss on October 31, 2024. Dkt. No. 33. On January 8, 2025, Plaintiff filed exhibits. Dkt. No. 40. On August 27, 2025, the Court denied the motions to dismiss without prejudice. Dkt. No. 44.

On September 10, 2025, Defendants filed a second motion to dismiss the SAC, with a supporting brief. Dkt. Nos. 45, 46. On September 11, 2025, the Court advised Plaintiff of his rights under *Roseboro,* and he responded on September 22, 2025, with a brief and exhibits. Dkt. No. 49.

The matter is now ripe, and, for the reasons that follow, the motion to dismiss will be granted in part and denied in part.[1]

## I. STANDARD OF REVIEW

Whether a complaint states a claim upon which relief can be granted is determined by "the familiar standard for a motion to dismiss under Fed. R. Civ. P. 12(b)(6)." *Sumner v. Tucker*, 9 F. Supp. 2d 641, 642 (E.D. Va. 1998). "A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citation omitted). In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true, and the complaint is viewed in the light most favorable to the plaintiff. *See Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993).

However, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957); *Jennings v. Emry*, 910 F.2d 1434, 1436 (7th Cir. 1990)

---

[1] The Court noted in the August 27, 2025 Memorandum Opinion and Order that, although Plaintiff uses the phrase "deliberate indifference" in his SAC, it is evident that he is raising an Eighth Amendment claim based upon the conditions of his confinement. Dkt. No. 44 at 2 n. 2 (citing *Rhodes v. Chapman*, 452 U.S. 337, 347, 349 (1981) (explaining that "[c]onditions must not involve the wanton and unnecessary infliction of pain, nor may they be grossly disproportionate to the severity of the crime warranting imprisonment" and that "[t]o the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society," noting that "the Constitution does not mandate comfortable prisons")). Defendants seek dismissal of most of the claims in the SAC for failure to state a condition of confinement claim, and Plaintiff's response states that "[a]ll defendants in this case have violated [his] 8th Amendment rights by not moving or reassigning [him] to a different job assignment," which is a consistent argument he raises in each of his claims and supports the Court's construction of his claims as based upon the conditions of his confinement. Dkt. No. 49 at 3.

(a pleading must be presented sufficient clarity that a court can follow it "without untoward effort" "to avoid requiring a district court or opposing party to forever sift through its pages in search" of the pleader's claims). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555).

In this context of a Rule 12(b)(6) motion, "the reviewing court must determine whether the complaint alleges sufficient facts 'to raise a right to relief above the speculative level' and 'to state a claim to relief that is plausible on its face.'" *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015) (quoting *Twombly*, 550 U.S. at 555). While all well-pleaded material facts are accepted as true and all inferences are drawn in the plaintiff's favor, *id.*, that presumption of truth is not applied "to 'conclusory statements' and 'legal conclusions'" in a complaint, *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017) (quoting *Iqbal*, 556 U.S. at 678). Further, a court may also consider "documents that are explicitly incorporated into the complaint by reference," documents "attached to the complaint as exhibits," and documents attached to a motion to dismiss as long as they are "integral to the complaint" and "authentic." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (internal quotation marks omitted). "[I]n the event of conflict between the bare allegations of the complaint and any exhibit attached . . . , the exhibit prevails." *Id.* (quoting *Fayetteville Inv'rs v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991)) (citations omitted). The Court may also take judicial notice of "matters of public record." *Goldfarb*, 791 F.3d at 508-09.

Where a complaint is filed by a prisoner acting *pro se*, however, that complaint must be construed liberally regardless of how unskillfully it is pleaded. *Haines v. Kerner*, 404 U.S. 519 (1972). A *pro se* litigant is therefore not held to the strict pleading requirements demanded of

3

attorneys. *Estelle v. Gamble*, 429 U.S. 97, 106-07 (1976); *see also Shaw v. Foreman*, 59 F.4th 121, 128 (4th Cir. 2023) ("This Court reads *pro se* pleadings to raise the strongest arguments that they suggest, and we consider whether a *pro se* civil rights plaintiff is entitled to relief under any legal theory that his factual allegations might plausibly convey.").

## II. STATEMENT OF FACTS[2]

### A. Parties

1.      Plaintiff was, at all times pertinent to this civil action, a prisoner detained in the VDOC, and, at the time this cause of action arose, he was housed at DCC. Dkt. No. 19 at 4.[3]

2.      At all times relevant to this civil action, Defendant Cheala D. Washington ("Defendant Washington") was DCC's Chief of Housing and Programs; Defendant Latesha Reid ("Defendant Reid") was a DCC Unit Manager; Defendant Darrell Miller ("Defendant Miller") was DCC's Warden; Defendant Jermiah Fitz, Jr. ("Defendant Fitz") was the VDOC Eastern Regional Director; Defendant Chadwick Dotson ("Defendant Dotson") was the Director of the VDOC; and Defendant J.D. Oates ("Defendant Oates") was an Assistant Warden at DCC. *Id.* at 1-3.

---

[2] The statement of facts is based upon Plaintiff's SAC, exhibits, and party admissions he made in his other pleadings. To the extent the documents relied upon by Plaintiff are inconsistent with his SAC, "on a motion to dismiss, 'in the event of a conflict between the bare allegations in the complaint and any exhibit attached, the exhibit prevails.'" *Wells v. Fuentes*, 126 F.4th 882, 893 n.10 (4th Cir. 2025) (quoting *Goines*, 822 F.3d at 166 (cleaned up)). Further, Plaintiff did not set out his version of the relevant facts, and the voluminous records he submitted in support of his claims are often duplicative, incomplete, and unorganized. Defendants' version of the relevant facts cites to only nine pages of the roughly 200 pages of documents Plaintiff submitted in support of his claims. *See* Dkt. Nos. 9, 14, 16, 17-1, 19-1, 40. The vast majority of those documents are complaints, grievances, and appeals filed by Plaintiff related to his claims. Defendants have not disputed the authenticity of any of the documents.

[3] Plaintiff was transferred to the Baskerville Correctional Center on or about November 15, 2023, Dkt. No. 16 at 28, and released from VDOC custody on or about June 26, 2025. Dkt. No. 42.

4

### B. Alleged Relevant Facts

3.     In January 2018, Plaintiff, a veteran, who alleges he has PTSD, was treated for "depression, anxiety, and sleeplessness," by the Veteran's Administration ("VA") and "prescribed medications for [those] conditions" and the VA recommended "counseling" as well. *Id.* at 6.

4.     Plaintiff was incarcerated in a local jail in June 2019. The jail continued providing him his VA-prescribed medications, and he was placed on "suicide watch" due to his alleged PTSD. In February 2021, Plaintiff was transferred to the VDOC, and he asked to be taken off "his medications so [he] could be transferred to a facility where he could work outside the gate." *Id.*

5.     On February 11, 2021, VDOC personnel conducted a Mental Health Appraisal ("MHA") of Plaintiff. The MHA's "Clinical History" portion included neither a diagnosis for nor mention of PTSD.[4] Dkt. No. 16 at 26. The MHA indicated that, in 2015, the VA Hospital in Hampton, Virginia, had treated Plaintiff for depression and anxiety, and prescribed three medications: Trazodone, BuSpar, and Celexa.[5] *Id.* At the time of his MHA, Plaintiff was no longer taking BuSpar and Celexa because he had asked to "be taken off" of them. *Id.*

---

[4] There is no medical evidence in the record that Plaintiff was ever diagnosed as having PTSD. Plaintiff repeats the allegation frequently in various documents authored by himself, but the medical records he submitted in support of his claims do not contain any such diagnosis. "Post-traumatic stress disorder (PTSD) is a mental health condition that's caused by an extremely stressful or terrifying event—either being part of it or witnessing it. Symptoms may include flashbacks, nightmares, severe anxiety and uncontrollable thoughts about the event." Mayo Clinic Staff, *Post-traumatic Stress Disorder (PTSD)*, Mayo Clinic (Aug. 16, 2024), www.mayoclinic.org/diseases-conditions/post-traumatic-stress-disorder/symptoms-causes/syc-20355967. The MHA did not note a previous PTSD diagnosis, only that he had been treated for depression and anxiety in the past. Additionally, Plaintiff does not identify any stressful or terrifying event that could be the basis for his alleged PTSD, nor did he reveal any such event when he was seen by DCC Mental Health on June 5, 2023, *see infra* at ¶¶ 15-18, he merely stated he had PTSD much the same as he has done in his SAC. However, at this stage of the litigation, the Court will assume that Plaintiff has alleged to several of the Defendants that he had PTSD.

[5] Trazodone "is an antidepressant . . . used to treat major depressive disorder." *Trazodone*, Drugs.com (Jan. 1, 2025), www.drugs.com/trazodone.html. "BuSpar is used to treat anxiety

6.    In May 2021, Plaintiff was transferred to the Bland Correctional Facility, assigned an "outside" job, and had no mental health or PTSD issues. Dkt. No. 19 at 6.

7.    On March 24, 2023, Plaintiff was transferred to the Patrick Henry Correctional Center ("PHCC"), a Level 1 Security facility, and was asked to fill out a "job application" to work at the "farm." Dkt No. 1 at 6; Dkt. No. 19 at 7. Approximately "3½ weeks" later, he was transferred to DDC, a Level 2 facility, and "forced into a Security Level 2 job assignment."[6] Dkt. No. 19 at 7. Plaintiff was not interviewed for the job, and he was not seen by a doctor or mental health specialist—which "violated VDOC OP 841.2." *Id.*[7]

---

disorders or the symptoms of anxiety, such as fear, tension, irritability, dizziness, pounding heartbeat, and other physical symptoms." *BuSpar*, Drugs.com (Aug. 13, 2023), www.drugs.com/buspar.html. "Celexa is a prescription medicine used to treat severe depression in adults, called major depressive disorder (MDD)." *Celexa*, Drugs.com (July 1, 2024), www.drugs.com/celexa.html.

[6] Plaintiff filed a grievance indicating he was present at DCC on April 20, 2023. Dkt. No. 16 at 98. There is no indication that the application he mentions being given at PHCC is the same one he references in his claims that he was forced to sign an application while he was at DCC.

[7] Plaintiff alleges that VDOC OP 841.2 required that he undergo a mental health examination before he was assigned to Flash Freeze. That regulation, in relevant part, states that "The Work PAR [Program Assignment Reviewer] should be responsible for . . . Consulting with Mental Health staff to determine if offenders are suitable for the vacant job based on such factors as the offender's current mental health status and treatment plan compliance, *when necessary*." Dkt. No. 19-1 at 2 (emphasis added) (citing VDOC OP 841.2(II)(B)(8) (effective July 1, 2020)). When Plaintiff was transferred to DCC, his "Mental Health Code [was]: 0," which indicated he was "suitable to work at DCC Flash Freeze Plant." Dkt. No. 16 at 80, 81. Although Plaintiff alleges that his Mental Health Code was "Code 2" when he entered the VDOC, he admits his score was lowered to Mental Health Code 0 "because of the job assignment" he had at the Bland Correctional Center. Dkt. No. 15 at 17. On June 5, 2023, Plaintiff's Mental Health Code was still "0" when he met with Senior Mental Health Clinician Wrenn. Dkt. No. 19-1 at 5.

In addition, VDOC OP 730.2(IV)(C)(2), *Mental Health and Wellness Services: Screening, Assessment, and Classification*, states if a newly "received inmate has a Mental Health Classification Code of MH-0, assigned within the past 12 months, no further review or evaluation by the Mental Health Clinician is required when the code remains the same." *See* Virginia

6

8.      Plaintiff's first day at Flash Freeze was May 2, 2023. Dkt. No. 15 at 10. On May 6, 2023, he filed a Written Complaint, DCC-23-INF-01046, complaining about not being assigned to "outside work." Dkt. 16 at 98. He argued, under VDOC OP 841.2, that inmates such as himself with a Security Level 1, which made him eligible for outside work assignments, "must be assigned to the appropriate work classification in accordance with Operating Procedure 425.1." *Id.* Plaintiff was a Level 1 inmate and assigned to Flash Freeze, which was a Level 2 work assignment.

9.      On May 9, 2023, Defendant Reid responded to the complaint stating that "[p]er

---

Department of Corrections, *Operating Procedure 730.2: Mental Health and Wellness Services: Screening, Assessment, and Classification* (Aug. 1, 2025), https://vadoc.virginia.gov/files/operating-procedures/700/vadoc-op-730-2.pdf. This information is properly considered by the Court. *See Fauconier v. Clarke*, 652 F. App'x 217, 219 (4th Cir. 2016) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (recognizing that a court may consider during Rule 12(b)(6) review any "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice"); *Hall v. Virginia*, 385 F.3d 421, 424 & n.3 (4th Cir. 2004) (taking judicial notice of information publicly available on official government website)); *see also, e.g.*, *Roemer v. Bd. of Pub. Works*, 426 U.S. 736, 742 n.4 (1976) (taking judicial notice of state regulation); *Baltas v. Maiga*, 119 F.4th 255, 265 n.4 (2d Cir. 2024) (citing *Christman v. Skinner*, 468 F.2d 723, 726 (2d Cir. 1972) (holding that it was proper for the district court to take judicial notice of state prison regulations)). VDOC OP 730.2(VI)(C) defines MH-0 as follows:

> The inmate has demonstrated mental health stability and no documented history of mental health treatment within the past 18 months (this does not include treatment for alcohol or substance use alone, nor for evaluation purposes alone). There is no documented or reported behavior and/or symptoms that currently indicates any mental health and wellness services warranted. No monitoring or treatment by a Mental Health Clinician is currently required.
>
> *Inmates coded as MH-0 may be assigned to any institution.*

(emphasis added). In short, VDOC OP 841.2 did not require a mental health examination or consultation with staff before Plaintiff began work at Flash Freeze on May 2, 2023.

7

policy the Unit Head or Designee based upon the institutional mission and offender population will determine the number of outside work crews and the work classification of each outside work crew[] to be established, Operating Procedure 425.1. You were entered for a transfer and SLW at your annual in April 2023." Dkt. 16 at 98.[8]

10.    On May 22, 2023, Plaintiff filed a Regular Grievance stating that under VDOC OP 841.2, DCC could not assign a Level 1 inmate, such as Plaintiff, "to a Level 2 work assignment," such as Flash Freeze. *Id.* Plaintiff complained that he had been given two "200 series charges . . . for missing work for putting in sick calls," that the charges "should be dismissed," and that he "should be excused from being forced to work at the Flash Freeze" because "it is a violation of Policy" for him to be "assigned there." *Id.* at 95. The grievance was denied at intake by the Ombudsman. Dkt. No. 15 at 10.[9]

11.    On May 26, 2023, Plaintiff filed an informal complaint, DCC-23-INF-1207, about his assignment to Flash Freeze, which reiterated the allegations in his prior informal complaint DCC-23-INF-01046, *see supra* at ¶ 8, and ended stating that it violated VDOC OP 841.2 to force him "to work at Flash Freeze." Dkt. No. 16 at 86, 88. Defendant Reid met with Plaintiff and told

---

[8] Operating Procedure 830.5, Transfers, Institution Reassignments, states that "Field Units and Work Centers are minimum security institutions designed to provide suitable confinement for lower risk inmates, increase productivity of inmates through work activity, and provide a cost-effective alternative to more traditional institution construction." VDOC OP 830.5(IV)(A). "SLW" is an acronym for Security Level W. SLW designated offenders are inmates who have not been convicted of "Murder I, Sex Offense, Kidnap/Abduction, No Escapes within the last 10 years as defined in the Institutional Assignment Criteria, No Flight/Failure to Appear Pattern, No Felony Detainers. Felony convictions for Murder II, Voluntary Manslaughter, Robbery with Weapon Present or Implied, Malicious Wounding, Unlawful Wounding, Maiming, and Felonious Assault, including multiple convictions," are "considered on a case-by-case basis," and can be determined at the [i]nitial and reclassification 7 years or less, and no 100 series charges in the last six months." VDOC OP 830.5(IV)(D)(1).

[9] The two charges were apparently dismissed by the hearing officer on June 1, 2023, for alleged non-compliance with VDOC OP 841.2. Dkt. No. 19-1 at 5.

him that if he did "not withdraw [his] complaint she would not approve his transfer to the Work-Center to be reassigned to a different job that complied with Operating Procedure 841.2." Dkt. No. 19 at 9.

12.     Defendant Reid responded to the complaint on May 30, 2023, stating that "[p]er policy the Director of the Department of Corrections, through the CCS, has the authority to assign *any* inmate to *any* institution deemed appropriate to facilitate effective bed management and main[tain] orderly operations with an ICA hearing." *Id.* (emphasis added). On June 2, 2023, Plaintiff filed a Regular Grievance that was denied as repetitive at intake by the Institutional Ombudsman, citing DCC-23-REG-00086. *Id.* at 80-81.

13.     On June 1, 2023, Plaintiff alleges that he wrote Defendant Miller a "4-page letter" stating that he had PTSD, his assignment to Flash Freeze violated VDOC policy, and that he "feared for [his] safety [by] being forced to work in Flash Freeze." Dkt. No. 15 at 15.

14.     On June 4, 2023, Plaintiff requested to be seen by Mental Health. On June 5, 2023, Senior Mental Health Clinician Wrenn saw Plaintiff, and her progress notes state he told her that his "charges were dropped Thursday. DCC's Warden said if [his] charges were dropped, he would approve my transfer . . . I can't sleep. I just can't work[] in that Flash Freeze inside all day with people around me . . . I'm a level one inmate. I should be at a work camp." Dkt. No. 19-1 at 5. Wrenn noted that Plaintiff's appearance, behavior, and speech were within normal limits; his thought processes were linear and logical; thought content was normal; no perceptual disturbances or hallucinations; he was alert; oriented to time, place, situation, and person; his memory was fine; and he was above average intelligence. Dkt. No. 16 at 11.

15.     Wrenn's assessment was that while Plaintiff

reported having PTSD, he indicated that he [had] not experienced significant mental health symptoms since 2018 when he was treated for depression in jail. He further indicated that, if he were removed from Flash Freeze and transferred to a level one facility, he would not need mental health services. Inmate Pearce is

9

attempting to have Mental Health staff ensure his removal from Flash Freeze without being charged and transferred to a higher-level facility.

*Id.*

16.     Wrenn encouraged Plaintiff to "follow institutional rules and continue working until his transfer was approved so that he [would] not receive any additional charges." *Id.*

> [Plaintiff] was also advised that, if his mental health status interferes with his ability to work in Flash Freeze, he will be removed from his job but will likely remain in a level 2 facility where mental health staff are on site for a period of time until he meets criteria to transfer back to a work center. [Plaintiff] . . . does not want this to happen and does not think he will need mental health treatment if removed from Flash Freeze. Coping skills were explored. [Plaintiff] indicated that he likes to go outside where he is not surrounded by people . . . . [and] that he likes to read but finds it difficult to concentrate due to the noise in the dorm. [Wrenn] suggested using earphones to block out the noise. . . . [and] provided [him] with coping skills cards naming a variety of coping techniques he can use while incarcerated. [Plaintiff] was advised to send a request form if he needs Mental Health staff again. He agreed to do so. Mental Health will follow as needed or requested.

*Id.* at 11-12.[10]

17.     On June 6, 2023, Plaintiff met with Defendant Oates, told him about his letter to Miller, and discussed his meeting with Wrenn. Oates explained to him that he had been classified as Medical Code A and Mental Health Code 0, and that he "should go to work like everyone else." Dkt. No. 15 at 17.

18.     On June 16, 2023, Plaintiff was charged with refusing to work and found guilty of that infraction on June 22, 2023. Dkt. No. 1 at 11. Plaintiff admits that he had "*not been reporting to work at all since the middle of May 2023,*" and that after June 16, 2023, there was a policy change, and he did not have to report to work if he "put a sick call in." Dkt. No. 15 at 18 (emphasis

---

[10] Plaintiff alleges that he was Mental Health Code 2 when he entered the VDOC, in 2019, and he was lowered to Mental Health Code 0 "because of the job assignment" at the Bland Correctional Center but was Mental Health Code 0 on June 5, 2023. Dkt. Nos. 15 at 17; 19-1 at 5.

added).[11] Plaintiff alleges that "the policy was change[d] the week after 6/16/23," and that an inmate did not "have to report to work if [the inmate] put a sick call in." *Id.* Plaintiff admits that he put in an Emergency Grievance every morning "stating that [h]e feared for [his] safety by being forced to work Flash Freeze." *Id.*

19.    On June 28, 2023, Plaintiff filed an informal complaint, DCC-23-INF-01488, that argued since the earlier two charges had been dismissed, based upon VDOC OP 841.2, that he should have been dismissed from Flash Freeze. Dkt. No. 16 at 54. On June 30, 2023, Defendant Reid responded and noted that the hearing officer had informed him that he "must continue to go to work unless you are being held in medical or until medical releases [him] from work. At this time, you have not been released from work[,] and you should continue to report to work. The charges being dismissed does not mean you don't report to work." *Id.*

20.    On June 22, 2023, Plaintiff was charged with "Lying or Giving False Information." Dkt. No. 15 at 19. The same hearing officer that had dismissed the two refusing to work charges in May 2023 found him guilty of the lying/false information charge on June 29, 2023. *Id.* at 20. On June 30, 2023, Plaintiff was given a 90-day suspension notice from his Flash Freeze assignment, which was effective July 3, 2023. *Id.* at 21; Dkt. No. 19-1.

21.    Plaintiff appealed his refusing to work conviction (offense date June 16, 2023), arguing, in part, that forcing him to work in Flash Freeze violated VDOC OP 841.2 and that his

---

[11] Plaintiff reported to his job assignment on May 2, 2023, and apparently stopped reporting via sick call requests in mid-May. There is no indication that Plaintiff reported for work in the second half of May 2023 or at all in June 2023. His 90-day suspension began on July 3, 2023, and went through October 3, 2023. Plaintiff was transferred to the Baskerville Correctional Center on or before November 15, 2023. There is no allegation in the SAC that Plaintiff worked in Flash Freeze after mid-May 2023, which is consistent with his statement that he put in an "emergency grievance every morning."

11

charge should be dismissed. *Id.* at 30-32; DCC-2023-0282. On August 16, 2023, Defendant Oates upheld his conviction stating that

> the purpose of the Appeal is not to argue the facts of [his] case once more, but address contentions, which were not answered, as well as to determine whether a procedural error occurred which prevented you from being afforded your due process rights. The contentions you have brought forth in your disciplinary appeal should have been raised during the disciplinary hearing. In review of the audio and documents related to this case, I find that there was sufficient evidence at your hearing to determine that you were in violation [of] code 200 Refusing work or refusing to attend school or other program in accordance with Operating Procedure 861.1 Offender discipline, Institutions.

*Id.* at 29. Defendant Fitz heard his Level II appeal, and after reviewing the audio recording of the disciplinary hearing, Plaintiff's arguments, and the information in VACORIS, concluded on December 1, 2023, that Plaintiff did "not want to work at Flash Freeze and" that Plaintiff was "attempting to present any and every excuse . . . to support [his] decision without supporting documentation and evidence. The preponderance of evidence supports this being your choice, and you must understand that your choices have consequences." Dkt. No. 16 at 15.[12]

22.     On July 5, 2023, Plaintiff's transfer to the "Work Center" was denied. Dkt. No. 1 at 12. He had an ICA hearing on July 11, 2023, and based upon his June 16 and June 22, 2023, convictions, his Security Level was raised to Level 2 (via application of an H6 override), and his Good Conduct Time level was increased to Level 4. Dkt. No. 16 at 41. On July 12, 2023, Defendant Washington approved raising Plaintiff's Security Level from Level 1 to Level 2, and on August 15, 2023, Defendant Washington approved raising Plaintiff's Good Conduct Time to Level 4, which resulted in his release date being changed from "12/16/24 to 12/22/25." Dkt. Nos. 19 at 10;

---

[12] Plaintiff admits he did not provide Defendant Fitz any of his records and argues that it was Fitz's responsibility to request Plaintiff's Mental Health records. *Id.* at 18.

19-1 at 17. In raising Plaintiff to Level 4, Washington used override #7, which Plaintiff alleges was "illegal." Dkt. No. 15 at 21-22 (discussing VDOC OP 830.3, Good Time Awards).[13]

23.     On July 10, 2023, Plaintiff filed a Regular Grievance regarding the alleged violation of VDOC OP 841.2. The grievance was refused at intake for failing to file the matter within 30 days of the original incident. Dkt. No. 19-1 at 9-13.

24.     Plaintiff, who is white, was convicted of refusing to work and had his Security Level raised from 1 to 2 and his Good Conduct Time Level raised from 1 to 4. Black inmates that worked in Flash Freeze "received multiple refusing to work charges and absolutely nothing happened to them. No ICA hearing to raise their security level or Good Time level. [Plaintiff] was racially targeted." Dkt. No. 19 at 11.

25.     On August 8, 2023, Plaintiff filed an informal complaint, DCC-23-INF-01837, arguing the charges that resulted in raising him from Level 1 to Level 2 were due to his being "illegally moved here and unwillingly being forced into a level 2 job that [he] cannot work due to PTSD issues." Dkt No. 16 at 36. On August 21, 2023, Defendant Reid responded stating that "[o]n 3/28/23 the Classification Unit approved [Plaintiff] . . . to be moved to [DCC] to participate in Flash Freeze work program. On 6/16/23 you received a 200-refusing to work charge that you were

---

[13] VDOC OP 830.3 provides that

> Staff will use overrides #7 and #P to place an inmate in the Class Level IV, upon their conviction of one of the applicable disciplinary offenses listed below, when an inmate:
>
> *       *       *       *
>
> Enroll in or attend, or is removed due to disruptive, non-participatory, or non-compliant behaviors, from any educational, program, vocational, or work assignment required on the inmate's Re-entry Plan. Staff will charge the inmate with Offense Code 200, Refusing to work or refusing to attend school or other program assignments mandated by procedure or by law, or failure to perform work or program assignment as instructed.

Dkt. No. 49-5 at 2, 3 (VDOC OP 830.3(III)(D)(1)(i)).

13

found guilty of. On 6/21/23 you received a 206-lying or giving false information to an employee charge that you were found guilty of. You currently have not shown stable adjustment in general population is part for SL2." *Id.*

26.     Plaintiff filed a Regular Grievance, DCC-23-REG-00218, complaining about being raised from Security Level 1 to Level 2. *Id.* at 34-35. On October 5, 2023, Defendant Oates' Level 1 response found the grievance unfounded, explaining that the

> Central Classification Committee (CCS) may administratively reassign offenders to other institutions without an [ICA] hearing for the purposes of managing the prison population. CCS may assign offenders temporarily to institutions that are not the same security level for purposes of interviews, courts, medical, psychological, security, special work assignments, etc. You were transferred here [DCC] by CCS to work Flash Freeze. Since your arrival, you have received a 200–refusing to work and a 206–lying or giving false information infractions that you were found guilty of. Since you received two infractions, you were administratively reviewed for an increase to SL2.

*Id.* at 33. On November 1, 2023, Defendant Fitz issued the Level 2 response, which upheld the Level 1 response. *Id.* at 42.

> In your grievance, you state that you are appealing your Security Level Classification going from a Security Level 1 to a Security Level 2 as of July 31, 2023. You state that you were forced to transfer to a Security Level 2 prison and into a Level 2 job assignment which is a violation.
>
> An investigation into your claims did not reveal evidence to overturn the ruling of the Level I respondent. Central Classification Services (CCS) may administratively reassign to another institution temporarily that are not the same security level for purposes of interviews, courts, special work assignments and other reasons. You were transferred to work at Flash Freeze. Since arrival on April 20, 2023, you have received two infractions and were administratively reviewed for an increase in Security Level assignment.

*Id.* at 29 (citing VDOC OP 830.5).

27.     Defendant Oates responded to Plaintiff's August 21, 2023, informal complaint, DCC-23-INF-1967, about Plaintiff's mental health concerns regarding his assignment to Flash Freeze. In his September 7, 2023 response, Defendant Oates stated that at the time of his transfer to DCC, Plaintiff was Medical Work Code "A," Medical Location Code "A," and Mental Health

14

Code "0"—which "met the criteria to work at DCC Flash Freeze Plant," and his "Medical Work Code, Medical Location Code, and his Mental Health Code *[had] not changed since he was [t]ransferred to DCC*." Dkt. No. 19-1 at 27 (emphasis added). Defendant Oates noted that Plaintiff had "elected not to work at the Flash Freeze Plant." *Id.*

28.     On August 23, 2023, Plaintiff filed an informal complaint, DCC-23-INF-01981, arguing that his assignment to Flash Freeze violated VDOC OP 841.2 because it caused him severe anxiety and anger problems that jeopardized his safety and security as well as that of others. Wrenn responded on September 1, 2023, noting that she had discussed the matter with Plaintiff and referred to the June 5, 2023 counseling session. Dkt. No. 16 at 68. Wrenn's response stated that if Plaintiff's "mental health status interfered with [his] ability to work in Flash Freeze [he] would be removed from [his] job but would be assigned [to] or remain in a facility with full time mental health staff. [His] mental health code would be increased to MH-2 to reflect [his] current mental status and service needs." *Id.*

29.     Defendant Reid instructed Counselor Bradshaw "to force" Plaintiff "to sign a blank job application for the Flash Freeze work assignment with the threat of an institutional charge if [he] didn't." Dkt. No. 19 at 8.

30.     Defendant Reid had multiple meetings with Plaintiff, but she refused "to re-assign" him or "remove" him from his Flash Freeze work assignment even though he filed "numerous complaints." *Id.* Plaintiff told her that he had PTSD "and the issues and conditions inside of Flash Freeze." *Id.*

31.     The conditions inside Flash Freeze were "extreme constant noise from machinery and . . . overcrowded close quarter working conditions" which caused Plaintiff "anxiety and anger episodes that put [his] safety at risk and the safety of others at risk." *Id.*

32.     Plaintiff sent many letters, grievances, and written complaints to Defendant Miller about his "situation at Flash Freeze" and complained "that nothing [had been] done about it." Dkt. No. 19 at 16. Defendant Miller only responded to one letter and instructed Plaintiff to "have [his] counselor put in for a transfer," which he had already done. *Id.* Miller refused to remove or re-assign Plaintiff to a different job assignment. *Id.* at 17.

33.     Plaintiff and his family members sent Defendant Dotson numerous letters and emails about Defendants Reid, Washington, Oates, Miller, and Fitz's "blatant violations of procedure," and Dotson forwarded the letters and emails to the various defendants. *Id.* at 19. Dotson refused to remove or re-assign Plaintiff to a different job or to have the allegedly false charges removed. *Id.*

34.     Plaintiff was transferred to the Baskerville Correctional Center on November 15, 2023. Dkt. No. 16 at 28.

## III. SAC

Plaintiff's SAC sets out seventeen discrete claims, many of which only concern one of the six defendants. Many of the claims simply rephrase the same argument over and over, which is that his assignment to the Flash Freeze plant at DCC violated his interpretation of VDOC OP 841.2. The claims are

1)     Defendants Washington, Reid, Oates, and Miller violated Plaintiff's "8th Amendment rights by forcing [him] to work a job assignment that was causing [him] harm due to a mental health condition [he has] (PTSD)." Dkt. No. 19 at 5.

2)     Defendant Fitz violated Plaintiff's "Due Process Rights by violating Procedure by not answering any of [Plaintiff's] issues or contentions and stating that [his] mental health condition is just an excuse not to work the job assignment." *Id.* (citing Level II appeal response for his offense No. 200, Refusing to Work). *Id.* at 5-7 (SAC ¶¶ 2-5).

3)     Defendant Reid violated Plaintiff's "8th Amendment rights by . . . instructing Counselor Bradshaw to force [him] to sign a blank job

application for the Flash Freeze work assignment with the threat of an institutional charge if [he] didn't." *Id.* at 8 (SAC ¶¶ 6a-6c).

4) Defendant Reid violated Plaintiff's "8th Amendment rights by . . . filing a written complaint in the second week of May '23 on the violation of procedure 841.2" which states that "[u]nder no circumstance will an offender be placed in a job assignment that jeopardizes their safety or security or the safety and security of others." *Id.* at 8-9 (SAC ¶¶ 6d).

5) Defendant Reid violated Plaintiff's "8th Amendment rights by not following Dr. Wrenn's recommendation that [he] be removed from the Flash Freeze if [his] mental health interfered with [his] ability to work the job assignment." *Id.* at 9 (SAC ¶ 6e (citing Dkt. 19-1 at 5-6)).

6) Defendant Reid violated Plaintiff's "8th Amendment rights by refusing to remove or reassign [Plaintiff] after 2 refusing to work charges were dismissed on the violation of Procedure 841.2. DCC-2023-0223 & DCC-2023-0225 were dismissed in June '23 on section 841.2," which states that "[u]nder no circumstance will an offender be placed in a job assignment that jeopardizes their safety or security or the safety and security of others. Both charges were dismissed on 6/1/23." *Id.* (SAC ¶ 6f).

7) Defendant Reid violated Plaintiff's "8th Amendment rights. . . . On 7/10/2[3] [Plaintiff] filed a written complaint, DCC-23-INF-01988, about the violation [of] 841.2 and the mental health issues Flash Freeze was causing. Ms. Reid is not a qualified Mental Health Provider and had no authority to answer a complaint that involved a mental health issue. She continued not to remove or re-assign [Plaintiff] to a different job assignment." *Id.* at 10 (SAC ¶ 6g (citing 19-1 at 14-15)).

8) Defendant Reid violated Plaintiff's "8th Amendment rights . . . . On 7/11/23 . . . [at an] ICA hearing (Institutional Classification Authority) to raise my security level to a 2, even though [Plaintiff] was still within Level 1 points. Raise [his] Good Time level from a 1 to a 4. Causing [him] to earn no Good Time at all and extending [his] release date from 12/16/24 to 12/23/25. The H6 override used to raise [his] security level states: Needs stable adjustment in a General Population. Not being able to work a job assignment that [he] was forced into because of a mental health condition . . . . [Plaintiff] was racially targeted." *Id.* at 11 (SAC ¶¶ 6h, 6i (citing 19-1 at 17-18)).

9) Defendant Reid violated Plaintiff's "8th Amendment rights. . . . On 6/16/23 instructing SGT Roper to violate multiple sections of Procedure 841.2 [by] writing [Plaintiff] a false refusing to work charge. . . ." *Id.* at 11-12 (SAC ¶¶ 6i, 6j).

10) Defendant Washington violated Plaintiff's "8th Amendment rights. . . . As of 8/1/23 . . . Warden Miller approved [Plaintiff's] Good Time being raised to a 4. On 8/15/23 [Defendant Washington] used her designee authority to bypass the Warden and used override #7 to place [Plaintiff] in Good Time Level 4. [Defendant Washington] maliciously, purposely, and racially

17

motivated violated the entire section of Operating Procedure 830.3, Good Time Awards, to raise [his] GCA to a 4." *Id.* at 12-13 (SAC ¶ 7 (citing Dkt. No. 19-1 at 20-23)).

11) Defendants Reid and Washington violated Plaintiff's "8th Amendment rights . . . . because of the blatant violation of Procedure by [Defendant] Reid and [Defendant] Washington falsely and racially motivated charging [Plaintiff] with refusing to work, having a[n] ICA hearing to raise [Plaintiff's] security level and Good Time level." *Id.* at 13-14 (SAC ¶ 7A).

12) Defendant Oates violated Plaintiff's "8th Amendment rights . . . . On two separate occasions [Plaintiff] had a face-to-face meeting with [Defendant] Oates about letters [Plaintiff] had written Warden Miller. These meetings took place in the last week of May '23 and in June '23. [They] discussed what [Plaintiff] had written Warden Miller. The mental health issues [Plaintiff] was having in Flash Freeze due to [Plaintiff's] PTSD condition. . . . [Defendant] Oates refused to remove [Plaintiff] or re-assign [him] to a different job assignment." *Id.* at 15 (SAC ¶ 8 (citing Dkt. No. 19-1 at 25-27)).

13) Defendant Oates violated Plaintiff's "Due Process Rights . . . . On 6/30/23 [Plaintiff] submitted a Level I appeal for the offense Code 200 'Refusing to Work.'" Defendant Oates violated Operating Procedure 861.1 by answering Plaintiff's appeal; by not answering Plaintiff's "contentions and issues" in his appeal; because Oates had a conflict of interest due to their "face-to-face meetings;" and by using "derogatory and false statements against" Plaintiff, allegedly establishing Oates was biased. *Id.* at 15-16 (SAC ¶¶ 8a, 8b, 8c (citing Dkt. No. 19-1 at 29-32)).

14) Defendant Miller violated Plaintiff's "8th Amendment rights" because, despite Plaintiff's letters, Defendant Miller did nothing about Plaintiff's "situation at Flash Freeze." Defendant Miller only responded to Plaintiff that he should have his "counselor put in for a transfer." *Id.* at 16-17 (SAC ¶ 9).

15) Defendant Fitz violated Plaintiff's "Due Process Rights . . . . On Dec. 1, 2023 [by answering Plaintiff's] Level II Appeal upholding the Level I response," and "by not answering any of [Plaintiff's] issues or contentions. [Fitz] states that the violations of procedure and the mental health issues [Plaintiff] was having due to PTSD are [Plaintiff's] making every excuse possible to not want to work at Flash Freeze, and [Plaintiff] did not provide supporting documentation and evidence." *Id.* at 17-18 (SAC ¶ 10 (citing Dkt. No. 19-1 at 34-36)).

16) Defendant Dotson violated plaintiffs' "8th Amendment rights by" not responding to Plaintiff's letters and emails from his family members. Defendant Dotson does not address Plaintiff's concerns and only forwards the correspondence to Reid, Washington, Oates, Miller, and Fitz, the same defendants that are allegedly violating plaintiff's due process rights. *Id.* at 19 (SAC ¶ 11).

18

17)     Defendants Reid, Oates, and Fitz violated Plaintiff's "8th Amendment rights . . . . On 7/12/24, [Defendant] Reid had an ICA hearing to raise [Plaintiff's] security level to a 2 from a 1 using the H6 override" even though Plaintiff "was still within level 1 points. . . .Getting a false Refusing to Work charge for a job assignment [Plaintiff is] being forced to work and cannot perform because of a mental health condition. . . ." *Id.* at 20-21 (SAC ¶¶ 12,12a (citing Dkt. No. 19 at 38-51)).

## IV. ANALYSIS

The Defendants' second motion to dismiss seeks to dismiss each of Plaintiff's claims arguing that they fail to state a claim upon which relief could be granted. The motion to dismiss is, in part deficient, as indicated herein, because it fails to address the allegations in support of several of the claims set out in Plaintiff's SAC. Plaintiff's claims and his opposition to the motion to dismiss rely primarily on the alleged violations of state statutes and regulations. Further, several of Plaintiff's claims overlap and/or are duplicative. For ease of reference, each claim will be discussed in turn.

The Eighth Amendment, upon nearly all of Plaintiff's claims are predicated, requires a minimum standard for the treatment of inmates by prison officials—prison conditions must not, among other things, involve "the wanton and unnecessary infliction of pain," *Rhodes*, 452 U.S. at 347, and prisons must provide prisoners with humane conditions of confinement, *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994) (citing *Helling v. McKinney*, 509 U.S. 25, 31 (1993)). In order to succeed on an Eighth Amendment claim for inhumane conditions of confinement, an inmate must establish: (1) that he was housed under conditions that were "'sufficiently serious' so that 'a prison official's act or omission results in the denial of the minimal civilized measure of life's necessities,'" and (2) and that the defendant was deliberately indifferent, which means "a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement *only* if he knows that inmates face a substantial risk of serious harm and disregards

19

that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 834, 847 (emphasis added); *id.* at 837-38 (requiring that the prison official "kn[ew] of and disregard[ed]" that risk).

In Claim 1, Plaintiff alleges that Defendants Washington, Reid, Oates, and Miller violated his Eighth Amendment rights by forcing him "to work a job assignment that was causing him harm due to a mental health condition [he has] (PTSD)." Dkt. No. 19 at 5. The Fourth Circuit has held that forcing inmates to work without pay for public benefit does not violate the Thirteenth Amendment's prohibition against involuntary servitude. *See Newell v. Davis*, 563 F.2d 123, 124 (4th Cir. 1977); *McLaughlin v. Royster*, 346 F. Supp. 297, 311 (E.D. Va. 1972) ("Prisoners validly convicted may be forced to perform work, whether or not compensated."). There is, therefore, no constitutional issue with the allegedly "forcing" Plaintiff to work. Plaintiff's claim is premised on an exception to that rule because he alleges that the Defendants were deliberately indifferent to the fact that his assigned work aggravated his alleged mental health condition (PTSD). To establish such a constitutional claim, Plaintiff must prove that the Defendants knowingly compelled him "to perform labor that is beyond [his] strength, dangerous to his or her life or health, or unduly painful." *Williams v. Norris*, 148 F.3d 983, 987 (8th Cir. 1998) (citations omitted); *see also Jackson v. Cain*, 864 F.2d 1235, 1246 (5th Cir. 1989) (recognizing that prison official's decision to place inmate on a work detail knowing that work would significantly aggravate the inmate's serious physical ailment constitutes deliberate indifference to a serious medical need); *Berry v. Bunnell*, 39 F.3d 1056, 1057 (9th Cir. 1994) ("[T]he Eighth Amendment does not apply unless prisoners are compelled to perform physical labor which is beyond their strength, endangers their lives or health, or causes undue pain." (citing *Howard v. King*, 707 F.2d 215, 219 (5th Cir. 1983); *Ray v. Mabry*, 556 F.2d 881, 882 (8th Cir. 1977)). Where the work is not cruel and unusual *per se*, Plaintiff can only satisfy the requirements for an Eighth Amendment violation "[w]hen the type of

work to which the convict is assigned admittedly worsens a pathological condition" and "the work

has been assigned with the knowledge of the condition and that it will be worsened thereby" or

"when [the work] has been continued with the same knowledge." *Jackson*, 864 F.2d at 1246

(quoting *Black v. Ciccone*, 324 F. Supp. 129, 133 (W.D. Mo. 1970)).

To the extent Plaintiff asserts an Eighth Amendment claim premised upon a violation of

VDOC OP 841.2, his claim has no merit. A state official's failure to abide by state procedural laws

or regulations does not present a federal due process issue, *Riccio v. County of Fairfax, Va.*, 907

F.2d 1459, 1469 (4th Cir. 1990), and is, therefore, not actionable under § 1983. "'[T]he mere fact

that a state agency violates its own procedures does not *ipso facto* mean that it has contravened

federal due process requirements.'" *Garraghty v. Corn. of Va., Dep't of Corr.*, 52 F.3d 1274, 1285

(4th Cir. 1995) (quoting *Morris v. City of Danville*, 744 F.2d 1041, 1048 n.9 (4th Cir. 1984)).

Further, none of Plaintiff allegations (right to a job or a particular job, or lower Good Time level

or raised security level) imply a protected liberty interest.[14]

---

[14] Plaintiff has no liberty interest in where he is housed, or in his daily routine. *See Gaston v. Taylor*, 946 F.2d 340, 343 (4th Cir. 1991) ("[C]hanges in a prisoner's location, variations of daily routine, changes in conditions of confinement . . . and the denial of privileges—matters which every prisoner can anticipate are contemplated by his original sentence to prison—are necessarily functions of prison management that must be left to the broad discretion of prison administrators to enable them to manage the prisons safely and efficiently."). Likewise, raising his security level as a result of an institutional conviction does not violate the Constitution. *See Slezak v. Evatt*, 21 F.3d 590, 594 (4th Cir. 1994) ("The federal constitution itself vests no liberty interest in inmates in retaining or receiving any particular security or custody status 'as long as the [challenged] conditions or degree of confinement . . . is within the sentence imposed . . . and is not otherwise violative of the Constitution.'" (internal quotations and citations omitted)); *see also Mills v. Holmes*, 95 F. Supp. 3d 924, 935 (E.D. Va. 2015) (holding, if, as result of this disciplinary conviction, an inmate "began to earn good time credits at a lower level, he has 'no protected liberty interest in remaining in or being assigned to a particular good conduct allowance level'"). Lastly, Plaintiff had no right to control his work assignment. *Altizer v. Paderick*, 569 F.2d 812, 813 (4th Cir. 1978) (noting that "work assignments of prisoners . . . are matters of prison administration, within the discretion of prison administrators"); *see also Women Prisoners of District of Columbia Dept. of Corr. v. District of Columbia*, 93 F.3d 910, 927 (D.C. Cir. 1996) (inmates do not have a constitutional right to work or educational opportunities); *Walker v. Gomez*, 370 F.3d 969, 973 (9th Cir. 2004) (noting Due Process Clause "'does not create a property or liberty interest in prison

To the extent he alleges he was forced to work under conditions injurious to his health, the medical records he submitted do not support that allegation. The medical records indicate that on February 11, 2021, when Plaintiff was received into the VDOC, a Mental Health Appraisal ("MHA") was conducted. Despite Plaintiff's continuous assertion that he was diagnosed as having PTSD, his MHA does not indicate a previous diagnosis of PTSD. The MHA indicates only that Plaintiff was treated by the VA in 2015 for anxiety and depression, that he was prescribed medications," and that he told VDOC personnel that they could "take [him] off" his medications but stated that he would like to continue Trazodone. Dkt. No. 16 at 13-14. Further, the medical records Plaintiff submitted indicate that when he began his work assignment at DCC on May 2, 2023, his Medical Work Code was "A" and his Mental Health Code was "0," which indicated that he was "suitable to work at DCC Flash Freeze Plant." Dkt. No. 16 at 80, 81. Plaintiff's Mental Health Code was still "0" when he was seen by Senior Mental Health Clinician Wrenn on June 5, 2023, after he had worked for a few weeks in Flash Freeze. *Id.* at 11.[15] Importantly, Wrenn's notes from June 5, 2023, state that, "[a]lthough Inmate Pearce reported having PTSD, *he indicated that he has not experienced significant mental health symptoms since 2018 when he was treated for depression in the jail*," and that, on June 5, 2023, Plaintiff had added "that, if he were removed from Flash Freeze and transferred to a level one facility, he would not need mental health services." *Id.* at 11 (emphasis added). Despite his assertions of having mental health issues during May and June 2023, Plaintiff admitted to Wrenn, as reflected in the exhibit he submitted, that he had not experienced any significant mental health issues since 2018.

---

employment'").

[15] *See supra* at note 7 (discussing Code MH-0).

In response to Plaintiff's statement that he would not need mental health services if he was removed from Flash Freeze and transferred to a Level 1 facility, Wrenn correctly advised him that "if his mental health status interfere[d] with his ability to work in Flash Freeze, he [would] be removed from his job but [would] likely remain in a level 2 facility where mental health staff [we]re on site for a period of time until he [met the] criteria to transfer back to a work center." *Id.* Plaintiff did "not want this to happen." *Id.* Additionally, Wrenn responded to an informal complaint by Plaintiff three months later on September 1, 2023, and reiterated that if Plaintiff's mental health status interfered with his ability to work in Flash Freeze, his Mental Health Code would be raised to "MH-2." *Id.* at 70.[16] Plaintiff executed his original complaint six days later on September 7, 2023. Dkt. No. 1 at 15. There is nothing in the record that indicates his mental health

.

---

[16] VDOC OP 730.2(VI)(C) defines MH-2 as follows:

> The inmate must have a documented significant DSM diagnosis or diagnosis of a personality disorder with symptoms that are usually mild to moderate but stable. The individual can typically function satisfactorily in a general population setting for extended periods. Monitoring by a Mental Health Clinician may be necessary. The inmate may be prescribed psychotropic medication.
>
> *Inmates coded as MH-2 will be assigned to institutions with full time mental health and wellness services staff.*
>
> *Inmates for whom treatment services are recommended or treatment needs are anticipated will be coded at least MH-2 to ensure assignment to an institution with full time mental health and wellness services staff.*

*Id.* (emphasis added). Further, to raise the MH level to MH-2, Plaintiff's MH level had to be either MH-1 or MH-0. *Id.* An inmate with a MH-1 level "does not currently require mental health treatment but has a history of self-directed violence, suicidal gestures or attempts, or mental health treatment within the past two years. The inmate is not prescribed psychotropic medication and can function satisfactorily in a general population setting. Inmates coded as MH-1 may be assigned to any institution." *Id.*

level had changed prior to or after he filed the original complaint.

The record also establishes that while Plaintiff filed informal complaints or regular grievances on May 6, 2023, May 22, 2023, May 24, 2023, June 2, 2023, June 5, 2023, June 8, 2023, and June 28, 2023, *id.* at 84, 86, 87, 93, 95, 98, 100; Dkt No. 19-1 at 16-17—he did not complain that his assignment to Flash Freeze had aggravated his alleged PTSD or mental health in any of those complaints. Instead, during May and June 2023, he pursued his interpretation of VDOC OP 841.2 (and related VDOC OPs) as a reason to remove him from Flash Freeze, arguing that DCC had not assigned him to outside work and that he was a Level 1 inmate and could not be assigned to a Level 2 job assignment. *Id.* (citing VDOC OP 425.1 and 841.2). Plaintiff's SAC exhibits indicate that the first time he mentioned PTSD was in a Regular Grievance filed on July 10, 2023. Dkt. No. 19-1 at 9. Prior to that grievance, the record reflects that Plaintiff had told Wrenn on June 5, 2023, that he had "*not experienced significant mental health symptoms since 2018 when he was treated for depression in the jail,*" *id.* at 5 (emphasis added), and that he had "not been reporting to work at all since the middle of May 2023." Dkt. No. 15 at 18.[17] *See supra* ¶ 23, and note 11.[18] Further, it is undisputed that he was suspended from his work assignment at

---

[17] In his first amended complaint filed on March 4, 2024, Plaintiff stated that when he was charged on June 16, 2023, with failure to report to work, he had "not been reporting at all since the middle of May 2023." Dkt. 15 at 18. Further, Plainitff stated that as of June 16, 2023, the policy changed and an inmate did not have to report to work if he put in a sick call request, and thereafter he had put in an Emergency Grievance "every morning," but he "was never seen by anyone." *Id.*

[18] In a subsequent informal complaint dated August 21, 2023, Plaintiff only argued non-compliance with VDOC OPs and did not mention PTSD. Dkt. No. 16 at 61. Both the July 10, 2023 and the August 21, 2023 informal complaints were filed during the period of Plaintiff's suspension from Flash Freeze. Additionally, his assertion that he mentioned PTSD in the alleged June 1, 2023 letter to Defendant Miller that he did not submit as an exhibit, *see supra* ¶ 18, is inconsistent with his statement to Wrenn on June 5, 2023, included as an exhibit, that he had "*not experienced significant mental health symptoms since 2018 when he was treated for depression in the jail.*" Dkt. No. 19-1 at 5.

24

Flash Freeze on July 3, 2023, for 90 days, ending on October 3, 2023, and that he was transferred to Baskerville Correctional Center on November 15, 2023. Dkt. No. 19-1 at 23. Plaintiff's medical and mental health status, as indicated by VDOC medical health officials based upon Plaintiff's exhibits, did not change during his time at DCC and there is no medical evidence that working at Flash Freeze worsened or aggravated his physical or mental health. Indeed, although he was transferred to Baskerville Correctional Center on November 15, 2023, there is no medical evidence that Plaintiff needed mental health services at Baskerville.

DCC prison officials are entitled to rely on the opinions, judgment, and expertise of medical personnel. *Shakka v. Smith*, 71 F.3d 162, 167 (4th Cir. 1995); *see also Iko v. Shreve*, 535 F.3d 225, 242 (4th Cir. 2008) (holding that once an inmate is placed in the care of appropriate medical personnel, "a nonmedical prison official will generally be justified in believing that the prisoner is in capable hands" (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004))); *McRaven v. Sanders*, 577 F.3d 974, 981 (8th Cir. 2009) ("A prison official may rely on a medical professional's opinion if such reliance is reasonable."). Defendants Washington, Reid, Oates, and Miller were entitled to rely upon the MHA by VDOC and the Central Classification Services (CCS) determination that Plaintiff met the criteria for the assignment to Flash Freeze, which included a MH Code 0 that had not changed when Wrenn saw him on June 5, 2023. Plaintiff has not established that the time he spent inside Flash Freeze worsened or aggravated any mental health issue he might have had, or that the Defendants knew he had a condition that might be aggravated by assigning him to Flash Freeze, much less knowledge that his assignment to Flash Freeze had worsened the alleged unknown condition. Further, as noted, Plaintiff did not raise his assertion that he had PTSD until July 10, 2023, but by that time he had already been suspended from Flash

25

Freeze and there is no allegation that he ever reported for work after mid-May 2023. *See supra* ¶ 23, and note 11. Claim 1 will thus be dismissed.

In Claim 2, Plaintiff alleges that Defendant Fitz violated his due process rights "by not answering any of [his] issues or contentions and stating that [his] mental health condition is just an excuse not to work the job assignment." Dkt. No. 19 at 5-7 (SAC ¶¶ 2-5). To the extent Plaintiff alleges that Defendant Fitz denied him his rights by the manner in which he answered a grievance, denied the appeal of a grievance, or denied an appeal from a disciplinary infraction, he has not stated a claim. First, it is clear that "inmates have no constitutional entitlement or due process interest in access to a grievance procedure." *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 541 (4th Cir. 2017); *see Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994) (no liability exists under § 1983 for a prison administrator's response to a grievance or appeal); *Scott v. Kelly*, 107 F. Supp. 2d 706, 710 (E.D. Va. 2000) ("It is well established that inmates do not have a constitutionally protected right to participate in a prison grievance procedure." (cleaned up)). Second, "[l]iability will only lie where it is affirmatively shown that the official charged acted personally in the deprivation of the plaintiff['s] rights." *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977). Consequently, "[r]uling against a prisoner on an administrative complaint does not cause or contribute to the violation." *George v. Smith*, 507 F.3d 605, 609-10 (7th Cir. 2007); *see also Stewart v. Beach*, 701 F.3d 1322, 1328 (10th Cir. 2012) ("The 'denial of a grievance, by itself without any connection to the violation of constitutional rights alleged by plaintiff, does not establish personal participation under § 1983.'" (citation omitted)).[19] Thus, Claim 2 will be dismissed.

---

[19] *See, e.g., Brown v. Angelone*, 938 F. Supp. 340, 345 (W.D. Va. 1996) (holding that violations of prison disciplinary appeal procedures do not implicate federal due process rights); *Chambers v. Wilson*, 2016 WL 775779, at *4 (E.D. Va. Feb. 24, 2016) ("[A] prisoner has no federal due process rights in the [disciplinary] appeal process."), *aff'd*, 669 F. App'x 129 (4th Cir. 2016).

In Claim 3, Plaintiff alleges that Defendant Reid violated his "8th Amendment rights by . . . instructing Counselor Bradshaw to force [him] to sign a blank job application for the Flash Freeze work assignment with the threat of an institutional charge if [he] didn't." Dkt. No. 19 at 8 (SAC ¶¶ 6a-6c). But, as noted above, convicted prisoners like Plaintiff "may be forced to perform work, whether or not compensated." *McLaughlin*, 346 F. Supp. at 311; *see Newell*, 563 F.2d at 124. In order to establish a constitutional claim based upon an allegation that he was coerced into working, Plaintiff must prove that Defendant Reid knowingly compelled him "to perform labor that is . . . dangerous to his . . . life or health, or unduly painful." *Williams*, 148 F.3d at 987. The violation only occurs if Plaintiff was assigned to a job by a prison official "with knowledge of the condition and that it will be worsened thereby or when it has been continued with the same knowledge." *Jackson*, 864 F.2d at 1246 (citation omitted).

As summarized *supra*, when Plaintiff was assigned to Flash Freeze, there was no evidence that he had a mental health condition that would be aggravated by working at Flash Freeze. Indeed, the information in the record submitted by Plaintiff indicates that he met the mental criteria for the job assignment when he was assigned to Flash Freeze, and that his mental health had not worsened a month later (after he had been working at Flash Freeze) when he met with a mental health counselor, Wrenn, on June 5, 2023. Plaintiff himself told Wrenn on June 5, 2023, that he had "not experienced significant mental health symptoms since 2018 when he was treated for depression in the jail." Dkt. No. 19-1 at 5. Accordingly, Plaintiff has failed to show that Defendant Reid violated the Eighth Amendment even if Plaintiff had been coerced into signing the application to work in Flash Freeze because he has not shown that he had any mental or medical condition that was aggravated by signing a job application to work in Flash Freeze; Defendant Reid was allowed to rely on the medical and mental health evaluations that indicated Plaintiff met the criteria for

27

assignment to Flash Freeze, and there is no evidence that his mental health "worsened." Therefore, Claim 3 will be dismissed.

In Claim 4, Plaintiff alleges that Defendant Reid violated his Eighth Amendment rights because she did not remove him from his assignment to Flash Freeze after he had filed "a written complaint in the second week of May '23" asserting that his assignment to Flash Freeze violated VDOC OP "841.2," which states that "[u]nder no circumstance will an offender be placed in a job assignment that jeopardizes their safety or security or the safety and security of others." Dkt. No. 19 at 8-9 (SAC ¶¶ 6d). Plaintiff further alleges that Defendant Reid told him that if he did not withdraw his informal complaint, she would not approve his transfer to the Work Center to be re-assigned to a different job that complied with Operating Procedure 841.2. *Id.* at 9. Putting aside the lack of merit of the portion of this claim that asserts Defendant Reid violated VDOC OP 841.2, *see supra*, the allegation that Defendant Reid attempted to coerce him into withdrawing his claim, in the light most favorable to Plaintiff, states a claim of retaliation for exercising his First Amendment rights. The Fourth Circuit has explicitly stated that "prison officials violate the First Amendment by retaliating against inmates for filing grievances." *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 545 (4th Cir. 2017). The motion to dismiss does not address the retaliation component of this claim, and it will therefore be denied with respect to Claim 4.

In Claim 5, Plaintiff alleges that Defendant Reid violated his "8th Amendment rights by not following Dr. Wrenn's recommendation that [he] would be removed from the Flash Freeze if [his] mental health interfered with [his] ability to work the job assignment." Dkt. No. 19 at 9 (SAC ¶ 6e (citing Dkt. 19-1 at 5-6)). It is undisputed that, when Wrenn met with Plaintiff on June 5, 2023, Plaintiff's mental health level had not changed from MH-0. Further, the records of that meeting submitted by Plaintiff do not establish that Wrenn either recommended that Plaintiff be

28

removed from Flash Freeze or that she determined that his assignment to Flash Freeze had a negative impact on Plaintiff's mental health.

On June 5, 2023, Wrenn met with Plaintiff after he requested to meet with DCC Mental Health. Dkt. No. 19-1 at 5. Plaintiff had complained about not being able to sleep and stated that he could not work "inside Flash Freeze all day with people all around" him, and he told Wrenn that his "charges had been dropped last Thursday," June 1, 2023, and that the "Warden [had] said if [his] charges were dropped he would approve [Plaintiff's] transfer." *Id.* Wrenn noted that Plaintiff's appearance, behavior, and speech were within normal limits; his thought processes were linear and logical; his thought content was normal; there were no perceptual disturbances or hallucinations; he was alert; he was oriented to time, place, situation, and person; his memory was fine; and he was above average intelligence. *Id.* Wrenn's assessment of Plaintiff was that was "attempting to have Mental Health staff ensure his removal from [his] job in Flash Freeze without being charged and transferred to a higher level facility." *Id.*

Wrenn then explained to Plaintiff that, "*if* his mental health status interferes with his ability to work in Flash Freeze," that while he would "be removed from his job," that he would "likely remain in a level 2 facility where mental health staff are on site for a period of time until he meets [the] criteria to transfer back to a work center." *Id.* (emphasis added). Plaintiff stated that he did not want to stay in a Level 2 facility and told Wrenn that he did "not think he [would] need mental health treatment if removed from Flash Freeze," and then the two discussed "[c]oping skills." *Id.* Wrenn did not make any recommendation as to Plaintiff's job assignment; she simply explained what would happen *if* a finding was made that working in Flash Freeze interfered with Plaintiff's mental health status—specifically that, if that determination were made, Plaintiff would remain in a Level 2 facility.

29

Accordingly, again there is nothing in the record that supports any improper reliance by Defendant Reid on the medical and mental health opinions of VDOC staff, and nothing that indicates Plaintiff's mental health worsened while he was at DCC. Thus, Claim 5 will be dismissed.

In Claim 6, Plaintiff alleges that Defendant Reid violated his "8th Amendment rights by refusing to remove or reassign [him] after [his two] refusing to work charges were dismissed on the violation of Procedure 841.2. DCC-2023-0223 & DCC-2023-0225 were dismissed in June '23 on section 841.2," which states that "[u]nder no circumstance will an offender be placed in a job assignment that jeopardizes their safety or security or the safety and security of others. Both charges were dismissed on 6/1/23." Dkt. No. 19 at 9 (SAC ¶ 6f). As with Claim 1, Plaintiff's claim is based upon an alleged violation of VDOC OP regulations. Accordingly, as with Claim 1, Plaintiff has failed to state a claim, and Claim 6 will be dismissed. *See Riccio* 907 F.2d at 1469.[20]

In Claim 7, Plaintiff alleges that Defendant Reid violated his "8th Amendment rights" when she answered a written complaint that he filed on July 10, 2023, DCC-23-INF-01988, in which he alleged a "violation [of] 841.2" and claimed that working at Flash Freeze caused him "mental health issues." Dkt. No. 19 at 10. Plaintiff states that "Reid is not a qualified Mental Health

---

[20] In addition, Plaintiff misrepresents the regulation upon which he relies. The portion of VDOC 841.2 concerning "safety and security" is a subsection of a regulation that concerns inmates with disabilities. In context, the regulation states that

> Inmates with disabilities must meet the requirements and be able to perform the specific job duties and responsibilities provided on the Work Assignment Position Description 841_F15. (5-ACI-7A-01; 2- CI-5A-1, 2-CI-5A-3).
>
> a. Inmates with an accommodation for their disability who meet the requirements of the position and can perform the specific job duties and responsibilities must be considered for the work assignment.
>
> b. *Under no circumstances, will the Work PAR place inmates in a work assignment that jeopardizes their safety or security or the safety and security of others.*

Dkt. No. 49-2 at 8 (VDOC OP 841.2(V)(B)(4)) (emphasis added).

Provider and had no authority to answer a complaint that involved a mental health issue. She continued not to remove or re-assign [Plaintiff] to a different job assignment." *Id.* (SAC ¶ 6g (citing Dkt. 19-1 at 14-15)). As with Claim 1, Plaintiff's claim is based upon an alleged violation of a regulation. Thus, Claim 7 also does not state a claim and will be dismissed. *See Riccio* 907 F.2d at 1469.[21]

In Claim 8, Plaintiff alleges that Defendant Reid violated his "8th Amendment rights" at an ICA hearing on July 11, 2023, during which his Security Level was raised to Level 2, even though he "was still within Level 1 points," and his Good Time level was raised "from a 1 to a 4. Causing [him] to earn no Good Time at all and extending [his] release date from 12/16/24 to 12/23/25."[22] Defendant Reid used an "H6 override . . . to raise [his] security level," which states the override is used when an inmate "Needs stable adjustment in a General Population." Plaintiff alleges that this was unlawful because he was not "able to work a job assignment that [he] was forced into because of a mental health condition" and that he "was racially targeted." Dkt. No. 19 at 11 (SAC ¶¶ 6h, 6i (citing Dkt. 19-1 at 17-18)).

Defendant Reid has failed to address the allegation that Plaintiff was racially targeted for application of the H6 override. While it appears that the override for raising the Good Time Credit Class Level may not involve discretion, VDOC OP 830.3, Good Time Awards, Class Level Evaluations, (III)(D)(2)(a)-(b), (d), the Security Level regulation refers to "H6" as a discretionary

---

[21] It is also unclear from the record and the regulations referenced if Defendant Reid had any authority to remove or re-assign Plaintiff from his assignment to Flash Freeze. VDOC 841.2 states that "[o]nly the Work PAR [Program Assignment Reviewer] can remove an inmate from a work assignment in accordance with the institutions Implementation Memorandum." Dkt. No. 49-2 at 10 (VDOC OP 841.2(VIII)(A)).

[22] Plaintiff's facts in support of this claim are refuted by his own admission that he was released from VDOC custody on or about June 26, 2025. Dkt. No. 42.

override. *See* VDOC OP 830.2, Security Level Classification, Determining Suitability and Acceptability, (III)(C)(6)(Recommendations for Discretionary Overrides). To make out a claim of unequal treatment based upon intentional discrimination based upon race, Plaintiff "must show both that 'he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination.'" *English v. Clarke*, 90 F.4th 636, 649 (4th Cir. 2024) (quoting *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001)). Here, Plaintiff has made only a general allegation; however, the motion to dismiss does not even acknowledge the allegation that the decision was racially motivated. The motion to dismiss Claim 8 will thus be denied without prejudice.

In Claim 9, Plaintiff alleges that Defendant Reid violated his "8th Amendment rights. . . . On 6/16/23 [by] instructing SGT Roper to violate multiple sections of Procedure 841.2 [by] writing [Plaintiff] a false refusing to work charge. . . ." *Id.* at 11-12 (SAC ¶¶ 6i, 6j). This claim is not premised on a denial of any of the due process protections available to Plaintiff in a disciplinary hearing.[23] Instead, Plaintiff's assertion is that his assignment to Flash Freeze violated VDOC OP 841.2.

As this Court has already held, Plaintiff's argument as to VDOC OP 841.2 has no merit, and, even putting that aside, the filing of a false charge does not constitute a constitutional

---

[23] An inmate's due process rights in a disciplinary hearing are: (1) twenty-four-hour advanced written notice of the charges against him, *Wolff v. McDonnell*, 418 U.S. 539, 5563-64 (1974); (2) "a written statement by the factfinders as to the evidence relied on and the reasons for the disciplinary action," *id.* at 564-65 (internal quotation marks and citation omitted); (3) an opportunity to call witnesses and present documentary evidence where doing so "will not be unduly hazardous to institutional safety or correctional goals," *id.* at 566; (4) assistance at the hearing if he is illiterate or if the matter is complex, *id.* at 570; and (5) a sufficiently impartial fact finder, *id.* at 570-71. To satisfy due process, the fact finder's decision during a prison disciplinary hearing must be supported by "some evidence." *Superintendent, Mass. Corr. Inst. Walpole v. Hill*, 472 U.S. 445, 455 (1985). Plaintiff has not alleged any viable violation of *Wolff* or *Hill*.

violation. Generally, "a false disciplinary charge cannot serve as the basis for a constitutional claim." *Cole v. Holloway*, 631 F. App'x 185, 186 (4th Cir. 2016); *see also Freeman v. Rideout*, 808 F.2d 949, 952-53 (2d Cir. 1986) (finding no due process violation when prison officer filed unfounded charges because inmate was granted hearing and had an opportunity to rebut charges). It is only where there is a resulting due process violation in proceedings on the allegedly false charge that it will give rise to a constitutional claim. *See, e.g., Smith v. Mensinger*, 293 F.3d 641, 653-54 (3d Cir. 2002) ("[D]ue process is satisfied where an inmate is afforded an opportunity to be heard and to defend against the allegedly falsified evidence and groundless misconduct reports. Thus, so long as certain procedural requirements are satisfied, mere allegations of falsified evidence or misconduct reports, without more, are not enough to state a due process claim." (citing *Freeman*, 808 F.2d at 951, 953)); *see also Sprouse v. Babcock*, 870 F.2d 450, 452 (8th Cir. 1989) (filing of false charges, "standing alone, do[es] not state [a] constitutional claim[]"). Thus, to the extent Plaintiff relies upon claims of false charges, his argument has no merit. Claim 9 will thus also be dismissed.

In Claim 10, Plaintiff alleges that Defendant Washington violated his "8th Amendment rights" because on "8/15/23 [Defendant Washington] used her designee authority to bypass the Warden and used override #7 to place [Plaintiff] in Good Time Level 4. [Defendant Washington], maliciously, purposely, and racially motivated violated the entire section of Operating Procedure 830.3, Good Time Awards, to raise [his] GCA to a 4." *Id.* at 12-13 (SAC ¶ 7 (citing Dkt. No. 19-1 at 20-23)). Here, again, Plaintiff has alleged that the decisions were racially motivated but the motion to dismiss does not even acknowledge the allegation. Thus, the motion to dismiss Claim 10 will be denied without prejudice.

In Claim 11, Plaintiff alleges that Defendants Reid and Washington violated his "8th Amendment rights . . . because of the blatant violation of Procedure by [Defendant] Reid and [Defendant] Washington falsely and racially motivated charging [Plaintiff] with refusing to work, having a[n] ICA hearing to raise [Plaintiff's] security level and Good Time level." *Id.* at 13-14 (SAC ¶ 7A). Again, the motion to dismiss does not address the allegation that Defendants Reid and Washington's actions were racially motivated. Accordingly, the motion to dismiss Claim 11 will be denied without prejudice.

In Claim 12, Plaintiff alleges that Defendant Oates violated his Eighth Amendment rights because he met with Oates, face-to-face, once in May 2023 and once in June 2023 "about letters [he] had written Warden Miller." Dkt. No. 19 at 15. In each meeting, he discussed with Oates that he had written Warden Miller about the "mental health issues [he] was having in Flash Freeze due to [his] PTSD condition" and Defendant Oates "refused to remove [Plaintiff] or re-assign [him] to a different job assignment." *Id.* (SAC ¶ 8 (citing Dkt. No. 19-1 at 25-27)). But here again Plaintiff's own records indicate that his alleged mental health had not worsened due to his relatively short time in Flash Freeze. Plaintiff had no medical or mental health issues that conflicted with his transfer to DCC to work in Flash Freeze, and his medical and mental health status had not changed as of June 5, 2023, when he admitted to Wrenn that he had not experienced any significant mental health issues since 2018. Indeed, the premise of Claim 12 is essentially the same as Claim 1, which this Court found had no merit. Consequently, Claim 12 will also be dismissed.

In Claim 13, Plaintiff alleges that Defendant Oates violated his due process rights during his Level I appeal "for the offense Code 200 'Refusing to Work'" because Oates violated Operating Procedure 861.1 by answering his appeal; because Oates did not answer his "contentions and issues" in his appeal; because Oates had a conflict of interest due to their "face-to-face

34

meetings"; and because Oates used "derogatory and false statements against" Plaintiff, which Plaintiff argues shows Oates was biased. Dkt. No. 19 at 15-16 (SAC ¶¶ 8a, 8b, 8c (citing Dkt. No. 19-1 at 29-32)).

Specifically, Plaintiff alleges that Defendant Oates violated VDOC OP 861.1 and denied him due process because Oates was the Level I reviewer when he appealed his institutional infraction for refusing to work, DCC-2023-0282, and because Oates was allegedly biased because he handled grievances related to his assignment to Flash Freeze. Oates upheld the institutional infraction on August 16, 2023. Dkt. No. 19-1 at 29. Plaintiff pursued a Level II appeal from Oates's decision and raised several issues on apeal, *id.* at 16-18, but he did not allege that Defendant Oates had violated VDOC 861.1 or that Oates was biased. On December 1, 2023, Defendant Fitz, the Level II reviewer, reviewed "the audio recording of the disciplinary hearing concerning case number DCC-2023-0282, [Plaintiff's] Level II Appeal arguments, and all information available in VACORIS," and determined the following:

> It appears you do not want to work at Flash Freeze and are attempting to present any and every excuse to support your decision without supporting documentation or evidence. The preponderance of evidence supports this being your choice, and you must understand that your choices have consequences.
>
> Your Level 1 Appeal Response is determined to be complete and has adequately tackled all your issues. This office finds no violations of due process or procedural errors; consequently, the charge is **UPHELD** based upon the greater weight of the evidence against you.

*Id.* at 34.

To the extent that a disciplinary conviction may be administratively appealed, "a prisoner has no federal due process rights in the appeal process." *Chambers v. Wilson*, 2016 WL 775779, at *4 (E.D. Va. Feb. 24, 2016), *aff'd*, 669 F. App'x 129 (4th Cir. 2016); *see also Moses v. Blocher*, 2009 WL 5931221, *5 (E.D. N.C. Jan. 16, 2009) ("*Wolff*, however, does not mandate that prison officials provide inmates with an appeal of a disciplinary decision. Because plaintiff does not have

a constitutional right to appeal his disciplinary conviction, he has failed to state a claim upon which relief may be granted." (citations omitted)), *aff'd*, 326 F. App'x 227 (4th Cir. 2009); *Brown v. Angelone*, 938 F. Supp. 340, 345 (W.D. Va. 1996) (holding that violations of prison's disciplinary appeal procedures do not implicate federal due process rights).[24] Therefore, Claim 13 does not state a claim and will be dismissed.

In Claim 14, Plaintiff alleges that Defendant Miller violated his Eighth Amendment rights because, despite Plaintiff's letters to Miller, Defendant Miller did nothing about his "situation at Flash Freeze," and only responded to Plaintiff that he should have his "counselor put in for a transfer." Dkt. No. 19 at 16-17 (SAC ¶ 9). Plaintiff faults Defendant Miller for not removing him from Flash Freeze or having him re-assigned. *Id.* at 17. Plaintiff apparently argued in a letter addressed to Defendant Miller on June 1, 2023, that he had PTSD, his assignment to Flash Freeze violated VDOC policy, and that he "feared for his safety" because he was forced to work in Flash Freeze. Plaintiff's argument is again the same as the one he raised in support of Claim 1—that he should have been removed form Flash Freeze or reassigned because his assignment to Flash Freeze violated VDOC OP 841.2. Dkt. No. 49. Thus, for the reasons previously set forth, Claim 14 will be dismissed.

In Claim 15, Plaintiff alleges that Defendant Fitz violated his "Due Process Rights . . . . On Dec. 1, 2023 [by answering his] Level II Appeal upholding the Level I response," and "by not answering any of [Plaintiff's] issues or contentions. [Fitz] states that the violations of procedure and the mental health issues [Plaintiff] was having due to PTSD are [his] making every excuse

---

[24] *See Rouse v. Andrews*, 2022 WL 258457, at *5 (E.D. Va. Jan. 27, 2022) (inmates do "not enjoy a procedural due process right to an appeal" (quoting *Coor v. Stansberry*, 2008 WL 8289490, at *2 (E.D. Va. Dec. 31, 2008)) (citing *Wolff*, 418 U.S. at 563-71; *Johnson v. Goord*, 487 F. Supp. 2d 377, 386 (S.D.N.Y. 2007))).

possible to not want to work at Flash Freeze, and [he] did not provide supporting documentation and evidence." Dkt. No. 19 at 17-18 (SAC ¶ 10 (citing Dkt. No. 19-1 at 34-36)). Claim 15 fails to state a claim because, as previously noted, Plaintiff does not have a due process right to an administrative appeal of his institutional conviction. Claim 15 will thus be dismissed.

In Claim 16, Plaintiff alleges that Defendant Dotson violated his "8th Amendment rights by" not responding to Plaintiff's letters and emails from his family members. Defendant Dotson did not address his concerns and forwarded his correspondence to Reid, Washington, Oates, Miller, and Fitz, the same Defendants that violated his due process rights. *Id.* at 19 (SAC ¶ 11).

As a preliminary matter, because Defendant Dotson was not personally involved in Plaintiff's transfer to DCC, assignment to Flash Freeze, complaints, disciplinary hearing, or any of the appeals, Plaintiff has failed to state a claim against him. *See Vinnedge*, 550 F.2d at 928 (holding "[l]iability will only lie where it is affirmatively shown that the official charged acted personally in the deprivation of the plaintiff['s] rights"). Further, a supervisor is not liable under § 1983 for mere negligence, or even gross negligence in "failing to detect and prevent subordinates' misconduct." *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988); *see also Baynard v. Malone*, 268 F.3d 228, 236 (4th Cir. 2001) ("[A] supervisory official who responds reasonably to a known risk is not deliberately indifferent even if the harm is not averted . . . ."). Instead, a supervisor "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what [he or she] might see." *Jones*, 856 F.2d at 992. This type of action is necessary because it is the "supervisor's participation in wrongdoing [that] will trigger liability." *Jasinski v. Adams*, 781 F.2d 843, 848 (11th Cir. 1986). Plaintiff's SAC indicates Dotson forwarded the correspondence to officials at the institutional level (Defendants Reid, Washington, Oates, Miller, and Fitz) to address, which is a reasonable action that did not condone anything. Dkt. No.

37

at 19 (SAC ¶ 11). Additionally, the emails Plaintiff references in support of this claim involve matters that were resolved against him via the grievance process that found no violations of VDOC Ops, or the correspondence was dated long after his transfer from DCC.[25] Thus, Claim 16 will be dismissed.

In Claim 17, Plaintiff alleges that Defendants Reid, Oates, and Fitz violated his Eighth Amendment rights at his ICA hearing on July 12, 2023.[26] Defendant "Reid had an ICA hearing to raise [Plaintiff's] security level to a 2 from a 1 using the H6 override" even though he "was still within level 1 points. . . . Getting a false Refusing to Work charge for a job assignment [Plaintiff is] being forced to work and cannot perform because of a mental health condition. . . ." *Id.* at 20-21 (SAC ¶¶ 12, 12a (citing Dkt. No. 19 at 38-51)). This claim is duplicative of other claims (Claims 1, 8, 10, and 11). Because Claim 17 is duplicative as to all three defendants, it will be dismissed.

## V. CONCLUSION

For the reasons outlined above, Defendants' motion to dismiss, Dkt. No. 46, will be GRANTED as to Claims 1-3, 5-7, 9, and 12-17; GRANTED as to the non-retaliation portion of Claim 4; and GRANTED as to the portions of Claims 8, 10, and 11 that do not allege racial discrimination. As no claim remains against Defendants Oates, Miller, Dotson, and Fitz, those Defendants are dismissed.

---

[25] Plaintiff attached ten emails to his response in opposition to the motion to dismiss. Three of the emails, dated December 12, 2023, April 4, 2024, and April 5, 2024, were sent after Plaintiff had already been transferred from DCC to Baskerville. Dkt. No. 40 at 13, 14, 22. The remaining seven emails involve matters that Plaintiff had pursued in his grievances and appeals, and those matters had been determined to be unfounded or were resolved against him. *Id.* at 15-21.

[26] In his SAC, Plaintiff included the date "7/12/24," Dkt. No. 19 at 20, which the Court will treat as a scrivener's error.

Defendants will be allowed thirty days from the date of this Memorandum Opinion and Order to renew their motion with respect to the remaining portions of Claims 4, 8, 10, and 11.

\* \* \*

Accordingly, it is hereby ORDERED that Defendants' motion to dismiss, Dkt. No. 45, is GRANTED-IN-PART AND DENIED-IN-PART. The motion is GRANTED as to Claims 1-3, 5-7, 9, and 12-17; GRANTED as to the non-retaliation portion of Claim 4; and GRANTED as to the portions of Claims 8, 10, and 11 that do not allege racial discrimination. The motion is DENIED WITHOUT PREJUDICE as to the retaliation portion of Claim 4; and DENIED WITHOUT PREJUDICE as to the portions of Claims 8, 10, and 11 that allege racial discrimination; and it is

FURTHER ORDERED that, as Plaintiff failed to state a claim against Defendants Oates, Miller, Dotson, and Fitz, each is DISMISSED as a defendant in this civil action; and it is

FURTHER ORDERED that Defendants will be allowed THIRTY (30) DAYS from the date of Memorandum Opinion and Order to renew their motion to dismiss with respect to the remaining portions of Claims 4, 8, 10 and 11. This ruling is interlocutory, and Plaintiff must wait for a final order to be entered before he can appeal this Memorandum Opinion and Order.

The Clerk is directed to send a copy of this Memorandum Opinion and Order to Plaintiff and to all counsel of record for Defendants.

Alexandria, Virginia
April ___/___ , 2026

/s/
Rossie D. Alston, Jr.
United States District Judge

39