IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| TIMOTHY PEARCE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:23-cv-1251 (RDA/JFA) |
| | ) | |
| DARRELL MILLER, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

On April 1, 2026, the Court dismissed Claims 1-3, 5-7, 9, and 12-17; dismissed the non-retaliation portion of Claim 4; and dismissed the portions of Claims 8, 10, and 11 that do not allege racial discrimination, which left two Defendants, Latesha Reid and Cheala Washington ("Defendants"). Dkt. 54 at 39. This matter is before the Court on Defendants' Third Motion to Dismiss Claims 8, 10, and 11, filed on May 8, 2026 in conjunction with a Memorandum in Support. Dkts. 58, 59. The Motion to Dismiss does not seek dismissal of Claim 4. Dkt. 59 at 2. On May 12, 2026, the Court advised Plaintiff ("Plaintiff" or "Pearce") of his rights under *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), Dkt. 62, and he responded on June 5, 2026 with a sworn brief. Dkt. 63. The matter is now ripe.

**I. STANDARD OF REVIEW**

Whether a complaint states a claim upon which relief can be granted is determined by "the familiar standard for a motion to dismiss under Fed. R. Civ. P. 12(b)(6)." *Sumner v. Tucker*, 9 F. Supp. 2d 641, 642 (E.D. Va. 1998). "A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir.

1992) (citation omitted). In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true, and the complaint is viewed in the light most favorable to the plaintiff. *See Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993).

However, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957); *Jennings v. Emry*, 910 F.2d 1434, 1436 (7th Cir. 1990) (a pleading must be presented sufficient clarity "to avoid requiring a district court or opposing party to forever sift through its pages in search" of the pleader's claims "without untoward effort"). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555).

In this context of a Rule 12(b)(6) motion, "the reviewing court must determine whether the complaint alleges sufficient facts 'to raise a right to relief above the speculative level' and 'to state a claim to relief that is plausible on its face.'" *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015) (quoting *Twombly*, 550 U.S. at 555). While all well-pleaded material facts are accepted as true and all inferences are drawn in the plaintiff's favor, *id.*, that presumption of truth is not applied "to 'conclusory statements' and 'legal conclusions'" in a complaint. *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017) (quoting *Iqbal*, 556 U.S. at 678). Further, a court may also consider "documents that are explicitly incorporated into the complaint by reference," documents "attached to the complaint as exhibits," and documents attached to a motion to dismiss as long as they are "integral to the complaint" and "authentic." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (internal quotation marks omitted). "[I]n the event of conflict between the bare allegations of the complaint and any exhibit attached . . . , the exhibit prevails."

*Id.* (quoting *Fayetteville Inv'rs v. Com. Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991) (citations omitted). The Court may also take judicial notice of "matters of public record." *Goldfarb*, 791 F.3d at 508-09.

Where a complaint is filed by a prisoner acting *pro se*, however, that complaint must be construed liberally regardless of how unskillfully it is pleaded. *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972). A *pro se* litigant is therefore not held to the strict pleading requirements demanded of attorneys. *Estelle v. Gamble*, 429 U.S. 97, 106-07 (1976); *see also Shaw v. Foreman*, 59 F.4th 121, 128 (4th Cir. 2023) ("This Court reads *pro se* pleadings to raise the strongest arguments that they suggest, and we consider whether a *pro se* civil rights plaintiff is entitled to relief under any legal theory that his factual allegations might plausibly convey.").

The remaining claims are as follows:

1) Claim 4: Defendant Reid violated Plaintiff's "8th Amendment rights by . . . filing a written complaint in the second week of May '23 on the violation of procedure 841.2" which states that "[u]nder no circumstance will an offender be placed in a job assignment that jeopardizes their safety or security or the safety and security of others." Dkt. 19 at 8-9.

   Claim 8: Defendant Reid violated Plaintiff's "8th Amendment rights . . . On 7/11/23 . . . [at an] ICA hearing (Institutional Classification Authority) to raise my security level to a 2, even though [Plaintiff] was still within Level 1 points. Raise [his] Good Time level from a 1 to a 4. Causing [him] to earn no Good Time at all and extending [his] release date from 12/16/24 to 12/23/25. The H6 override used to raise [his] security level states: Needs stable adjustment in a General Population. Not being able to work a job assignment that [he] was forced into because of a mental health condition . . . . [Plaintiff] was racially targeted." *Id.* at 10-11 (citing 19-1 at 17-18).

   Claim 10: Defendant Washington violated Plaintiff's "8th Amendment rights. . . . As of 8/1/23 . . . Warden Miller had disapproved [Plaintiff's] Good Time being raised to a 4. On 8/15/23 [Defendant Washington] used her designee authority to bypass the Warden and used override #7 to place [Plaintiff] in Good Time Level 4. [Defendant Washington] maliciously, purposely, and racially motivated violated the entire section of Operating Procedure 830.3, Good Time Awards, to raise [his] GCA to a 4." *Id.* at 12-13 (citing 19-1 at 20-23).

   Claim 11: Defendants Reid and Washington violated Plaintiff's "8th Amendment rights . . . . because of the blatant violation of Procedure by [Defendant] Reid and [Defendant] Washington falsely and racially motivated charging [Plaintiff] with

refusing to work, having a[n] ICA hearing to raise [Plaintiff's] security level and Good Time level." *Id.* at 13-14.

## II. STATEMENT OF FACTS[1]

1. At all times relevant to this action, Pearce was a prisoner detained in the Virginia Department of Corrections ("VDOC"), housed at the Deerfield Correctional Center ("DCC"). Dkt. 19 at 4.[2]

2. At all times relevant to this action, Defendant Cheala D. Washington ("Washington") was Department of Community Correction's ("DCC") Chief of Housing and Programs; Defendant Latesha Reid ("Reid") was a DCC Unit Manager. *Id.* at 1-3.

3. In January 2018, Pearce, a veteran, was treated for "depression, anxiety, and sleeplessness," by the Veteran's Administration ("VA") and "prescribed medications [for those] conditions" and the VA also "recommended counseling." *Id.* at 6.

4. Pearce was incarcerated in a local jail in June 2019. The jail provided him his VA prescribed medications and placed him on "suicide watch" because he alleged he had PTSD. *Id.* In February 2021, he was transferred to the VDOC and he asked to be taken off "his medications so [he] could be transferred to a facility where he could work outside the gate." *Id.*

[1] The statement of facts is based upon Pearce's SAC, exhibits, and admissions he made in his other pleadings. To the extent the documents relied upon by Pearce are inconsistent with his SAC, "on a motion to dismiss, 'in the event of a conflict between the bare allegations in the complaint and any exhibit attached, the exhibit prevails.'" *Wells v. Fuentes*, 126 F.4th 882, 893 n.10 (4th Cir. 2025) (quoting *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016)). Further, Pearce did not set out his version of the relevant facts and the voluminous records he submitted in support of his claims are often duplicative, incomplete, and unorganized. The Defendants rely on the April 1, 2026 Memorandum Opinion and Order's statement of facts. The vast majority of Pearce's documents are administrative complaints, grievances, and appeals he filed with the VDOC. Defendants have not disputed the authenticity of any of the documents. The current statement of facts contains several minor edits to those set out in the April 1, 2026 Memorandum Opinion and Order, and other edits will be explained within the statement of facts. Defendants Oates, Miller, and Fitz, are mentioned in the statement of facts for context. All three were dismissed in the April 1, 2026 Memorandum Opinion and Order.

[2] Pearce was transferred to the Baskerville Correctional Center ("BCC") on or about November 15, 2023. Dkt. 16 at 28. Pearce was released from VDOC custody over one year ago, on or about June 26, 2025. Dkt. 42.

5. On February 11, 2021, the VDOC conducted Pearce's Mental Health Appraisal ("MHA"), and the "Clinical History" portion of the MHA did not include either a diagnosis for or mention of PTSD. Dkt. 16 at 26. The MHA indicated that in 2015, the VA Hospital in Hampton, Virginia had treated Pearce for depression and anxiety, and prescribed three medications: Trazadone, Buspar, and Celexa.[3] *Id.* at 25. At the time of his MHA, Pearce was no longer taking Buspar and Celexa because he had asked to "be taken off" of them. *Id.*

6. In May 2021, Pearce was transferred to the Bland Correctional Facility ("Bland"), assigned an "outside" job. He had no mental health or PTSD issues.[4] Dkt. 19 at 6.

7. On March 24, 2023, Pearce was transferred to the Patrick Henry Correctional Center, a Level 1 Security facility, and was asked to fill out a "job application" to work at the "farm." Dkts. 1 at 6; 19 at 7.[5] Approximately "3½ weeks" later, without being interviewed for the job, he was transferred to DCC, a Level 2 facility, and "forced into a Security Level 2 job

---

[3] Trazadone "is an antidepressant . . . used to treat major depressive disorder." *See Drugs.com: Know more. Be sure,* https://www.drugs.com (search "Trazodone") (last viewed Aug. 13, 2026). "Buspar is used to treat anxiety disorders or the symptoms of anxiety, such as fear, tension, irritability, dizziness, pounding heartbeat, and other physical symptoms." *Id.* (search "Buspar'). "Celexa is a prescription medicine used to treat severe depression in adults, called major depressive disorder (MDD)." *Id.* (search "Celexa").

[4] There is no medical evidence in the record that Pearce was ever diagnosed as having PTSD. Plaintiff repeats the allegation frequently in various documents authored by himself, but the medical records he submitted in support of his claims do not contain any such diagnosis. "Post-traumatic stress disorder (PTSD) is a mental health condition that's caused by an extremely stressful or terrifying event—either being part of it or witnessing it. Symptoms may include flashbacks, nightmares, severe anxiety and uncontrollable thoughts about the event." *See* Mayo Clinic, *Post Traumatic Stress Disorder*, https://www.mayoclinic.org/diseases-conditions/post-traumatic-stress-disorder/symptoms-causes/syc-20355967 (last viewed Aug. 13, 2026). The MHA did not note any previous PTSD diagnosis, only that he had been treated for depression and anxiety in the past. Additionally, Pearce does not identify any stressful or terrifying event that could be the basis for his alleged PTSD, nor did he reveal any such event when he was seen by DCC Mental Health on June 5, 2023, *see infra* ¶¶ 13-18; he merely stated that he had PTSD much the same as he has done throughout his SAC. At this stage of the litigation, the Court will assume that Plaintiff has alleged to the Defendants that he had PTSD.

[5] Reid instructed Bradshaw "to force" Pearce "to sign a blank job application for the Flash Freeze work assignment with the threat of an institutional charge if [he] didn't." Dkt. 19 at 8.

assignment."[6] Dkt. 19 at 7. Pearce was not seen by a doctor or mental health specialist—which he alleges "violated VDOC OP 841.2." *Id.*[7]

8. Pearce's first day at Flash Freeze was May 2, 2023. Dkt. 15 at 10. On May 6, 2023, he filed a Written Complaint, DCC-23-INF-01046, complaining that he had not been assigned to "outside work." Dkt. 16 at 98. He argued, citing VDOC OP 841.2, that a Security Level 1 inmate such as himself was eligible for outside work assignments and that he "must be assigned to the appropriate work classification in accordance with Operating Procedure 425.1." *Id.*

[6] Pearce filed a grievance indicating he was present at DCC on April 20, 2023. Dkt. 16 at 98. There is no indication that the application he mentions being given at DCC is the same one he references in his claims that he was forced to sign while he was at DCC. *See infra* ¶ 28, and at 24-25.

[7] Pearce alleges that VDOC OP 841.2 required that he undergo a mental health examination before being assigned to Flash Freeze, but that regulation, in relevant part, states that "The institution Work PAR [Program Assignment Reviewer] should be responsible to . . . Consulting with Mental Health staff to determine if offenders are suitable for the vacant job based on such factors as the offender's current mental health status and treatment plan compliance, *when necessary*." Dkt. 19–1 at 2 (citing VDOC OP 841.2(II)(B)(8)) (effective, July 1, 2020) (emphasis added). When transferred to DCC, Pearce's "Mental Health Code [was]: 0," indicating he was "suitable to work at DCC Flash Freeze Plant." Dkt. 16 at 80-81. Pearce's allegation that his Mental Health Code was "Code 2" when he entered the VDOC, is disproved by his own admission that his score was lowered to "Code 0" "because of the job assignment" at Bland. Dkt. 15 at 17. Further, Pearce's Mental Health Code was still "0" when he met with Wrenn on June 5, 2023. Dkt. 19-1 at 5. In addition, VDOC OP 730.2(IV)(C)(2), Mental Health and Wellness Services: Screening, Assessment, and Classification, states if a newly "received inmate has a Mental Health Classification Code of MH-0, assigned within the past 12 months, *no further review or evaluation by the Mental Health Clinician is required when the code remains the same*." *See* Virginia Department of Corrections, *Locate An Imate*, https://vadoc.virginia.gov/ (General Public, Operating Procedure, 700 Series, Health Services & Mental Health and Wellness Services) (last viewed Aug. 13, 2026) (emphasis added)*; see also Fauconier v. Clarke*, 652 F. App'x 217, 219 (4th Cir. 2016) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (recognizing during Rule 12(b)(6) review a court may consider any "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice"); *Hall v. Virginia*, 385 F.3d 421, 424, 424 n.3 (4th Cir. 2004) (taking judicial notice of information publicly available on official government website); *see, e.g.*, *Baltas v. Maiga*, 119 F.4th 255, 265 n.4 (2d Cir. 2024) (citing *Christman v. Skinner*, 468 F.2d 723, 726 (2d Cir. 1972) (holding it was proper for court to take judicial notice of state prison regulations)). VDOC OP 730.2(VI)(C) defines MH-0 as follows:

> The inmate has demonstrated mental health stability and no documented history of mental health treatment within the past 18 months (this does not include treatment for alcohol or substance use alone, nor for evaluation purposes alone). There is no documented or reported behavior and/or symptoms that currently indicate[] any mental health and wellness services warranted. No monitoring or treatment by a Mental Health Clinician is currently required.
>
> *Inmates coded as MH-0 may be assigned to any institution.*

(emphasis added). In short, despite Pearce's allegation, VDOC OP 841.2 did not require a mental health examination or consultation with staff before Pearce began work at Flash Freeze on May 2, 2023.

9. On May 9, 2023, Reid responded to the complaint stating that "[p]er policy the Unit Head or Designee based upon the institutional mission and offender population will determine the number of outside work crews and the work classification of each outside work crew[] to be established, Operating Procedure 425.1. You were entered for a transfer and SLW at your annual in April 2023." Dkt. 16 at 98.[8]

10. On May 22, 2023, Pearce filed a grievance stating that DCC could not assign a Level 1 inmate, such as Pearce, "to a Level 2 work assignment," such as Flash Freeze. *Id.* (citing VDOC OP 841.2). Pearce complained that his two "200 series charges . . . for missing work for putting in sick calls" "should be dismissed," and that he "should be excused from being forced to work at the Flash Freeze" because "it is a violation of Policy" for him to be "assigned there." *Id.* at 98. The grievance was denied at intake by the Ombudsman. Dkt. 15 at 10.

11. On May 26, 2023, Pearce filed an informal complaint, DCC-23-INF-1207, about his assignment to Flash Freeze that reiterated his previous informal complaint DCC-23-INF-01046, *see supra* ¶ 8, and ended stating that it violated VDOC OP 841.2 to force him "to work at Flash Freeze." Dkt. 16 at 86, 88. Reid met with Pearce and told him that if he "didn't withdraw [his] complaint she would not approve his transfer to the Work Center to be reassigned to a different job that complied with Operating Procedure 841.2." Dkt. 19 at 9.

12. Reid responded on May 30, 2023, stating that "[p]er policy the Director of the Department of Corrections, through the CCS, has the authority to assign *any* inmate to *any*

[8] Operating Procedure 830.5, Transfers, Institution Reassignments, states that "Field Units and Work Centers are minimum security institutions designed to provide suitable confinement for lower risk inmates, increase productivity of inmates through work activity, and provide a cost-effective alternative to more traditional institution construction." VDOC OP 830.5(IV)(A). "SLW" is an acronym for Security Level W, and the SLW designation means an inmate has not been convicted of "Murder I, Sex Offense, Kidnap/Abduction, No Escapes within the last 10 years as defined in the Institutional Assignment Criteria, No Flight/Failure to Appear Pattern, No Felony Detainers. Felony convictions for Murder II, Voluntary Manslaughter, Robbery with Weapon Present or Implied, Malicious Wounding, Unlawful Wounding, Maiming, and Felonious Assault, including multiple convictions," are "considered on a case-by-case basis," and can be determined at the "[i]nitial and reclassification 7 years or less, and no 100 series charges in the last six months." VDOC OP 830.5(IV)(D)(1).

institution deemed appropriate to facilitate effective bed management and main[tain] orderly operations with an ICA hearing." Dkt. 16 at 86 (emphasis added). On June 2, 2023, Pearce filed a grievance, DCC-23-REG-00086, that was denied at intake because it was repetitive. *Id.* at 83-84.

13. On June 4, 2023, Pearce requested to be seen by Mental Health. On June 5, 2023, Senior Mental Health Clinician Wrenn saw Pearce and her progress notes state he told her that his "charges were dropped Thursday."[9] DCC's Warden said if [his] charges were dropped, he would approve my transfer . . . I can't sleep. I just can't work[] in that Flash Freeze inside all day with people around me . . . I'm a level one inmate. I should be at a work camp." Dkt. 19-1 at 5. Wrenn noted that his appearance, behavior, and speech were within normal limits; his thought processes were linear and logical; thought content was normal; no perceptual disturbances or hallucinations; he was alert; oriented to time, place, situation, and person; his memory was fine; and he was above average intelligence. Dkt. 16 at 11.

14. Wrenn's assessment was that while Pearce

> reported having PTSD, he indicated that he [had] not experienced significant mental health symptoms since 2018 when he was treated for depression in jail. He further indicated that, if he were removed from Flash Freeze and transferred to a level one facility, he would not need mental health services. Inmate Pearce is attempting to have Mental Health staff ensure his removal from Flash Freeze without being charged and transferred to a higher-level facility.

*Id.*

15. Wrenn encouraged Pearce to "follow institutional rules and continue working until his transfer was approved so that he [would] not receive any additional charges." *Id.*

> He was also advised that, if his mental health status interferes with his ability to work in Flash Freeze, he will be removed from his job but will likely remain in a level 2 facility where mental health staff are on site for a period of time until he meets criteria to transfer back to a work center. He . . . does not want this to happen

[9] The two charges were apparently dismissed by the hearing officer on June 1, 2023 for alleged non-compliance with VDOC OP 841.2. Dkt. 19-1 at 5.

> and does not think he will need mental health treatment if removed from Flash Freeze. Coping skills were explored. Pearce indicated that he likes to go outside where he is not surrounded by people . . . . [and] that he likes to read but finds it difficult to concentrate due to the noise in the dorm. [Wrenn] suggested using earphones to block out the noise. . . . [and] provided [him] with coping skills cards naming a variety of coping techniques he can use while incarcerated. He was advised to send a request form if he needs Mental Health staff again. He agreed to do so. Mental Health will follow as needed or requested.

*Id.* at 11-12*; see supra* note 7 (on June 5, 2023, Pearce's Mental Health Code was "Code 0").[10]

16. On June 16, 2023, Pearce was charged with refusing to work and found guilty of that infraction on June 22, 2023. Dkt. 1 at 11; VDOC OP 861.1, Inmate Discipline, Category II Code of Offenses (Code 200(a), "Refusing to work . . . or failure to perform work . . . as instructed"). He admits that he had "*not been reporting to work at all since the middle of May 2023*," and alleges that after June 16, 2023, there was a policy change, and he did not have to report to work if he "put a sick call in." Dkt. 15 at 18 (emphasis added).[11] The penalty imposed was a "Reprimand." Dkt. 19-1 at 29.

17. Pearce alleges that "the policy was change[d] the week after 6/16/23," and that an inmate did not "have to report to work if [the inmate] put a sick call in." *Id.* Pearce admits that he put in an Emergency Grievance every morning "stating that [h]e feared for [his] safety by being forced to work Flash Freeze." Dkt. 15 at 18.

18. On June 28, 2023, Pearce filed an informal complaint, DCC-23-INF-01488, arguing that since two earlier charges had been dismissed, based upon VDOC OP 841.2, that he should have been dismissed from Flash Freeze. Dkt. 16 at 57. On June 30, 2023, Reid responded

---

[10] On June 6, 2023, Plaintiff met with Oates, told Oates about his letter to Miller, and discussed his meeting with Wrenn. Oates explained to him that he had been classified as Medical Code A and Mental Health Code 0, and that he "should go to work like everyone else." Dkt. 15 at 17.

[11] Pearce reported to his job assignment on May 2, 2023, and apparently stopped reporting via sick call requests in mid-May. There is no indication that Plaintiff reported for work in the second half of May 2023 or at all in June 2023. Pearce was transferred to the BCC on or before November 15, 2023. There is no allegation in the SAC that Plaintiff worked in Flash Freeze after mid-May 2023, which is consistent with his statement that he put in an "emergency grievance every morning."

and noted that the hearing officer had informed him that he "must continue to go to work unless you are being held in medical or until medical releases [him] from work. At this time, you have not been released from work[,] and you should continue to report to work. The charges being dismissed does not mean you don't report to work." *Id.* at 56.

19. On June 22, 2023, Pearce was charged with "Lying or Giving False Information." Dkt. 15 at 19; VDOC OP 861.1, Inmate Discipline, Category II Code of Offenses (Code 206, Lying or giving false information to an employee). The charge for "Lying or Giving False Information" was "written by Counselor Bradshaw" who claimed that Pearce "lied about why [he] didn't want to go to work." Dkt. 15 at 19. The same hearing officer that had dismissed the two refusing to work charges from May 2023 found him guilty of the lying/false information charge on June 29, 2023. *Id.* at 20.

20. On June 30, 2023, Pearce was given a 90-day suspension notice from his Flash Freeze assignment, effective July 3, 2023. *Id.* at 21; Dkt. 19-1 at 23.

21. Pearce appealed the refusing to work conviction (offense date June 16, 2023), arguing, in part, that forcing him to work in Flash Freeze violated VDOC OP 841.2 and that his charge should be dismissed. *Id.* at 30-32; DCC-2023-0282. On August 16, 2023, Oates upheld his conviction stating that

> the purpose of the Appeal is not to argue the facts of [his] case once more, but address contentions, which were not answered, as well as to determine whether a procedural error occurred which prevented you from being afforded your due process rights. The contentions you have brought forth in your disciplinary appeal should have been raised during the disciplinary hearing. In review of the audio and documents related to this case, I find that there was sufficient evidence at your hearing to determine that you were in violation [of] code 200 Refusing work or refusing to attend school or other program in accordance with Operating Procedure 861.1 Offender discipline, Institutions.

*Id.* at 29. Fitz heard his Level II appeal, reviewed the audio recording of the disciplinary hearing, Pearce's arguments, and the information in VACORIS, and concluded on December 1, 2023, that

Pearce did "not want to work at Flash Freeze and" that he was "attempting to present any and every excuse . . . to support [his] decision *without supporting documentation and evidence*. The preponderance of evidence supports this being your choice, and you must understand that your choices have consequences." Dkt. 16 at 15 (emphasis added).[12]

22. On July 5, 2023, Pearce's transfer to the "Work Center," was denied. Dkt. 1 at 12. On July 11, 2023, Bradshaw (his counselor) and Reid conducted an ICA hearing regarding Pearce's two recent infractions. Dkt. 1 at 12. Based upon his June 16 and June 22, 2023 convictions, his Security Level was raised to Level 2, (via application of an H6 override) and his Good Conduct Time ("GCT") level was increased to Level 4. Dkt. 16[13] at 41.[14] On July 12, 2023, Washington approved raising Pearce's Security Level from Level 1 to Level 2, and on August 15, 2023, Washington approved raising his GCT to Level 4, which resulted in his release date being changed from "12/16/24 to 12/22/25." Dkts. 19 at 10, 19-1 at 17. In raising Pearce to Level 4, he

---

[12] Pearce admits he did not provide Fitz with any of his records and argues that it was Fitz's responsibility to request his Mental Health records. *Id.* at 18.

[13] VDOC OP 861.1 XIII(E)(1) states that upon a conviction, "[i]f the outcome of the hearing is likely to affect the inmate's housing status, Security Level, or Good Time Award Level, the Hearings Officer should refer the inmate to the Institutional Classification." The regulation references VDOC OP 830.1 II(A), which states in relevant part that "Staff must conduct a formal ICA hearing for administrative and interim reviews outside the inmate's annual review cycle when there is the opportunity for the inmate to be removed from general population status, for the inmate's good time earning level to be reduced, for the inmate's security level to be increased, for the inmate to be transferred to a higher security level institution, or there is a loss of liberty involved."

[14] VDOC OP 830.3 provides that

> Staff will use overrides #7 and #P to place an inmate in the Class Level IV, upon their conviction of one of the applicable disciplinary offenses listed below, when an inmate:
>
> * * * *
>
> Enroll in or attend, or is removed due to disruptive, non-participatory, or non-compliant behaviors, from any educational, program, vocational, or work assignment required on the inmate's Re-entry Plan. Staff will charge the inmate with Offense Code 200, Refusing to work or refusing to attend school or other program assignments mandated by procedure or by law, or failure to perform work or program assignment as instructed.

Dkt. 49-5 at 2, 3 (VDOC OP 830.3(III)(D)(1)(i)). Oates upheld the use of a #7 override to raise Pearce's GCT Level to 4. *See infra* ¶ 23. In addition, An H-6 override is applied when an inmate "[n]eeds to establish stable adjustment in a general population and/or at recommended security level prior to consideration for a lower level." VDOC OP 830.2(III)(C)(6)(f).

alleges Washington "illegally used" override #7. Dkt. 15 at 21-22 (discussing VDOC OP 830.3, Good Time Awards).

23. The ICA form does not explicitly reference the #7 override as the basis for raising his GCT to Level 4; instead, the form indicates that Pearce was "currently being scored at a good time level 4 due to receiving a 200- for refusing to work in Flash Freeze. Inmate was assigned to [DCC] for that purpose," and that the "Rationale" for the recommendation to change Pearce's GCT to Level 4 was "due to [his] score of 40 points and Disciplinary Offense 200 - Refusing to Work on 6/16/2023." Dkt. 16 at 43. However, on October 6, 2023, the Level 1 appeal upheld the increase in GCT Level to Level 4. Oates upheld the denial of his grievance and rejected Pearce's interpretation of VDOC OP 830.3.

> Beginning in June, staff began documenting your refusal to go to work. In response, you gave several excuses from being unsafe, to not having enough sleep, to submitting sick calls and not following through. You were assessed by mental health at one point because you stated you have been off your meds which was another reason you did not want to work at Flash Freeze. You refused the treatment from the mental health staff. After that process and the information . . . provided to the staff, you were informed that you had to return to work. After that, you received an infraction for refusing to work stating that you are not supposed to be on the list and a 206- lying and giving false information because you alleged that the Assistant Warden instructed you not to go. *Per 830.3. Staff will use overrides #7 and #P to place an inmate in the Class Level IV, upon their conviction of one of the applicable disciplinary offenses listed below, when an inmate is removed due to disruptive, non-participatory, or non-compliant behaviors, from any educational, program, vocational, or work assignment required on the inmate's Re-entry Plan. Staff will charge the inmate with Offense Code 200,* Refusing to work or refusing to attend school or other program assignments mandated by procedure or by law, or failure to perform work or program assignment as instructed.

Dkt. 14-1 at 1.

24. On July 10, 2023, Pearce filed a grievance alleging a violation of VDOC OP 841.2 when he was assigned to Flash Freeze because it jeopardized his and others safety. The grievance was refused at intake because it was not filed within 30 days of the original incident. Dkt. 19-1 at 9-13.

25. Pearce, who is white, was convicted of refusing to work and had his Security Level raised from 1 to 2, and his GCT Level raised from 1 to 4. He alleges that Black inmates that worked in Flash Freeze "received multiple refusing to work charges and absolutely nothing happened to them. No ICA hearing to raise their security level or Good Time level. [Pearce] was racially targeted." Dkt. 19 at 11.

26. On August 8, 2023, Pearce filed an informal complaint, DCC-23-INF-01837, arguing the charges that resulted in raising him from Level 1 to Level 2 were due to his being "illegally moved here and unwillingly being forced into a level 2 job that [he] cannot work due to PTSD issues." Dkt. 16 at 36. On August 21, 2023, Reid responded stating that "[o]n 3/28/23 the Classification Unit approved" his transfer to DCC to work in the Flash Freeze program. After the June 16, 2023 "200-refusing to work" and the June 21, 2023 "206-lying or giving false information to an employee" convictions, Pearce "currently ha[d] not shown stable adjustment in general population is part for SL2." *Id.*

27. Pearce filed a grievance, DCC-23-REG-00218, complaining about being raised from Security Level 1 to Level 2. *Id.* at 34-35. On October 5, 2023, the response found the grievance unfounded, explaining that the

> Central Classification Committee (CCS) may administratively reassign offenders to other institutions without an [ICA] hearing for the purposes of managing the prison population. CCS may assign offenders temporarily to institutions that are not the same security level for purposes of interviews, courts, medical, psychological, security, special work assignments, *etc*. You were transferred here [DCC] by CCS to work Flash Freeze. Since your arrival, you have received a 200–refusing to work and a 206–lying or giving false information infractions that you were found guilty of. Since you received two infractions, you were administratively reviewed for an increase to a SL2.

*Id.* at 33. On November 1, 2023, the Level 2 response upheld the Level 1 response. *Id.* at 29.

> In your grievance, you state that you are appealing your Security Level Classification going from a Security Level 1 to a Security Level 2 as of July 31, 2023. You state that you were forced to transfer to a Security Level 2 prison and into a Level 2 job assignment which is a violation.

> An investigation into your claims did not reveal evidence to overturn the ruling of the Level I respondent. Central Classification Services (CCS) may administratively reassign to another institution temporarily that are not the same security level for purposes of interviews, courts, special work assignments and other reasons. You were transferred to work at Flash Freeze. Since arrival on April 20, 2023, you have received two infractions and were administratively reviewed for an increase in Security Level assignment.

*Id.* at 29 (citing VDOC OP 830.5).

28. Oates responded to Pearce's August 21, 2023 informal complaint, DCC-23-INF-1967, that alleged mental health concerns due to his assignment to Flash Freeze, stating that at the time of his transfer to DCC, Pearce was Medical Work Code "A," Medical Location Code "A," and Mental Health Code "0"—which "met the criteria to work at DCC Flash Freeze Plant," and his "Medical Work Code, Medical Location Code, and his Mental Health Code *[had] not changed since he was [t]ransferred to DCC.*" Dkt. 19-1 at 27 (emphasis added). Oates noted that Plaintiff had "elected not to work at the Flash Freeze Plant." *Id.*

29. On August 23, 2023, Pearce filed an informal complaint, DCC-23-INF-01981, again arguing that his assignment to Flash Freeze violated VDOC OP 841.2 because it had caused him severe anxiety and anger problems that jeopardized his safety and security as well as that of others. Wrenn responded on September 1, 2023, noting that she had discussed the matter with Pearce and referred to their June 5, 2023 counseling session. Dkt. 16 at 68. Wrenn's response stated that if Pearce's "mental health status interfered with [his] ability to work in Flash Freeze [he] would be removed from [his] job but would be assigned [to] or remain in a facility with full time mental health staff. [His] mental health code would be increased to MH-2 to reflect [his] current mental status and service needs." *Id.*

30. Reid had multiple meetings with Pearce, but she refused "to re-assign" him or "remove" him from Flash Freeze even though he had filed "numerous complaints." *Id.* Pearce told her that he had PTSD "and the issues and conditions inside of Flash Freeze . . . extreme

constant noise from machinery and . . . overcrowded close quarter working conditions" which caused Pearce "anxiety and anger episodes that put [his] safety at risk and the safety of others at risk." *Id.*

31. Plaintiff was transferred to the BCC on November 15, 2023. *Id.* at 28.

## III. DISCUSSION

The Defendants' Third Motion to Dismiss seeks dismissal of the remaining portions of Claims 8, 10, and 11 that alleged racial discrimination. The Defendants argue that the racial discrimination portion of each Claim fails to state a cognizable claim against them because Pearce "has not pled sufficient facts to demonstrate a difference in treatment from inmates who were similarly situated or 'in all relevant respects alike,'" which is necessary to allege racial discrimination. Dkt. 59 at 2, 4 (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)." Additionally, Defendants argue that Pearce has also failed to state a claim because he offers "only [a] general allegation[] that he 'was racially targeted'" and therefore he "fails to plausibly allege that any difference in treatment 'was the result of intentional or purposeful discrimination.'" *Id.* at 4 (quoting *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001)). In response, Pearce alleges that while several black inmates were charged and found guilty of refusing to work, the only punishment for those black inmates was being suspended from work, while Pearce was "singled out" for the malicious, purposeful, and racially motivated use of the "overrides." Dkt. 63 at 1.

To state an equal protection claim, Pearce must allege that: (1) he and a comparator inmate were treated differently, *and* that they were each similarly situated; and (2) that the different treatment resulted from discrimination. *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002) (emphasis added); *accord English v. Clarke*, 90 F.4th 636, 649 (4th Cir. 2024) (plaintiff "must show both that 'he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination'") (quoting

*Morrison*, 239 F.3d at 654); *see Nordlinger*, 505 U.S. at 10 (stating that a plaintiff must plausibly allege that he and his hypothetical counterpart are similarly situated in "all relevant aspects alike"). "In the equal protection context, 'similarly situated' means that the individuals 'are in all relevant respects alike.'" *Stevens v. Holder*, 966 F. Supp. 2d 622, 641 (E.D. Va. 2013) (quoting *Veney*, 293 F.3d at 730-31 (quoting *Nordlinger*, 505 U.S. at 10)).[15] Further, he must allege facts to show discriminatory intent or purpose, not merely discriminatory impact. *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 2665 (1977); *Morrison*, 239 F.3d at 654.[16]

In Claim 8, Pearce alleges that Reid violated his "8th Amendment rights" at an ICA hearing on July 11, 2023 by raising his Security Level to Level 2, even though he "was still within Level 1 points;" and raising his Good Time level "from a 1 to a 4," which caused him "to earn no Good Time at all and extend[ed] [his] release date from 12/16/24 to 12/23/25."[17] The H-6 override that Reid used to raise Pearce's security level is used when an inmate "[n]eeds to establish stable adjustment in a general population and/or at recommended security level prior to consideration for a lower level." VDOC OP 830.2(III)(C)(6)(f). Not being able to work a job assignment that [he]

---

[15] In discussing an equal protection claim similar to Pearce's, the Western District concluded that the complaint did not state a claim under 28 U.S.C. § 1915A because the plaintiffs had not and could not

> demonstrate that, in all respects relevant to a discretionary classification decision, they are similarly situated to the inmate whose security score was overridden in 2009. Many legitimate factors besides security level score play into such decisions, such as inmates' eligibility for rehabilitation programs, percentage of time served on the criminal sentence, time left to serve before release, and a host of other variables impossible for plaintiffs to match completely. The court must dismiss plaintiffs' equal protection claims, pursuant to § 1915A, as frivolous.

*Baines v. Barlow*, No. 7:10-cv-535, 2010 WL 5477690, at *3 (W.D. Va. Dec. 30, 2010).

[16] If a plaintiff satisfies these requirements, "the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." *Morrison*, 239 F.3d at 654 (citing *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439-40 (1985); *In re Long Term Admin. Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464, 471 (4th Cir. 1999); *Sylvia Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810, 818-19 (4th Cir. 1995)).

[17] Plaintiff's allegation that his release date was extended to December 23, 2025 is negated by his own admission that he was released from VDOC custody about six months earlier than he alleges, on or about June 26, 2025. Dkt. 42. His GCT level was obviously lowered from Level 4 at some point and yet he still maintains in his sworn response that a year, "Dec. 22, 2024 to Dec. 2025," was illegally taken. Dkt. 63 at 3.

was forced into because of a mental health condition . . . . [Plaintiff] was racially targeted." Dkts. 19 at 11, 19-1 at 17-18.[18]

Here, the SAC alleges that "[s]everal Black inmates that worked [in] Flash Freeze received multiple *refusing to work charges* and absolutely nothing happened to them. No ICA hearing to raise their security level or Good Time level. [Pearce] was racially targeted." Dkt. 19 at 11 (emphasis added). Pearce, however, fails to note or appreciate several facts. First, he was convicted of not only refusing to work on June 16, 2023, but also "Lying or Giving False Information" on June 21, 2023.[19] Second, he committed both charges within less than one week of each other. Third, there is no evidence that Reid had any involvement in any of the unnamed comparators (black inmates that worked at Flash Freeze who were charged with refusing to work) upon which his allegation of racial discrimination against Reid relies.[20]

Lastly, as noted in *Baines*, there could have been legitimate reasons why the alleged outcome for unnamed comparators had different outcomes or treatment than the suspension

[18] *See, e.g.*, *Firewalker-Fields v. Va. Dep't of Corr.*, No. 1:20-cv-1338, 2022 WL 2293903, at *2 (E.D. Va. June 13, 2022) ("On March 4, 2021, though, the ICA noted that it had erred in recommending a Level 1 security assignment and used an 'H6 override' to recommend a Level 3 assignment. Put simply, although plaintiff's 'score'—a metric based on a number of considerations such as the severity of an inmate's offense and whether he has received any disciplinary convictions—met the requirements for a Level 1 security code, the ICA concluded that plaintiff 'needed to establish stable adjustment in a general population and/or at the recommended security level prior to consideration for a lower level.'").

[19] In his SAC, Pearce refers to his convictions as "false charges." His characterization of the charges as false is not supported by the record. Pearce admits he did not report for work during June 2023, and the record establishes that he was told he had to report to work even if he claimed he was sick. *See supra* notes 8-9, 11-12. The April 1, 2026 Memorandum Opinion and Order found that Pearce's June 16, 2023 conviction for refusing to work did not violate due process; that the evidence satisfied the "some evidence" requirement of *Superintendent, Mass. Corr. Inst. Walpole v. Hill*, 472 U.S. 445, 455 (1985) (Dkt. 54 at 32); and that a "claim premised upon a violation of VDOC OP 841.2," had no merit because "[a] state official's failure to abide by state procedural laws or regulations does not present a federal due process issue, *Riccio v. Cnty. of Fairfax, Va.*, 907 F.2d 1459, 1469 (4th Cir. 1990), and is, therefore, not actionable under § 1983." Dkt. 54 at 21 (citing *Garraghty v. Comm. of Va., Dep't of Corr.*, 52 F.3d 1274, 1285 (4th Cir. 1995) (quoting *Morris v. City of Danville*, 744 F.2d 1041, 1048 n.9 (4th Cir. 1984)).

[20] Importantly, Pearce was convicted by a Hearing Officer, not by Reid. Even then, he had two levels of appeal, and Reid was not involved in either level of appeal. *See Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012) ("[C]onstitutional torts . . . require a demonstration of both but-for and proximate causation" and "intervening acts of other[s]" may "insulate" a defendant from liability.). There is no need for a prolonged discussion of causation because Pearce has failed to establish that he is similarly situated with any of the unnamed Black Flash Freeze workers.

imposed upon Pearce. The unnamed comparators could have admitted the offense[21] and were given credit for acceptance of responsibility; they could have had a defense (legitimately sick); or a variety of other excuses.

Pearce has neither established that he and the unnamed comparator inmates were treated differently *and* that they were similarly situated, "mean[ing] that the individuals 'are in all relevant respects alike,'" *Stevens*, 966 F. Supp. 2d at 641; nor has he established that the different treatment resulted from discrimination. Claim 8 will be dismissed.

In Claim 10, Pearce alleges that Washington violated his "8th Amendment rights" because on "8/15/23 [she] used her designee authority to bypass the Warden and used override #7 to place [Pearce] in Good Time Level 4. [Washington], maliciously, purposely, and racially motivated violated the entire section of Operating Procedure 830.3, Good Time Awards, to raise [his] GCA to a 4." Dkts. 19 at 12-13,19-1 at 20-23.[22] Pearce, however, does not identify comparators in support of his allegations of racial discrimination against Washington. Assuming that he relies on the same comparator argument as in Claim 8, for the reasons already set forth above, *see supra* at 16-17, Pearce has not established that he and any unnamed comparator inmates were treated differently *and* that they were similarly situated, "mean[ing] that the individuals 'are in all relevant respects alike.'" *Stevens*, 966 F. Supp. 2d at 641; and he has also failed to establish that the alleged different treatment resulted from discrimination. Claim 10 will be dismissed.

In Claim 11, Plaintiff alleges that Reid and Washington violated his "8th Amendment rights . . . . because of the blatant violation of Procedure by Reid and Washington falsely and

---

[21] Other inmates could have accepted a "Penalty Offer," which is "[a] process whereby an inmate accused of a disciplinary offense may plead guilty to the offense, accept a defined penalty, and avoid a formal disciplinary hearing." VDOC OP 861.1, Definitions.

[22] As noted above, Oates found the use of the #7 override as the basis for raising his GCT to Level 4 was proper. This is another instance where Pearce's theory fails.

racially motivated charging [Plaintiff] with refusing to work [and] having a[n] ICA hearing to raise [Plaintiff's] security level and Good Time level." Dkt. 19 at 13-14. As discussed above, Pearce has not established that he and any unnamed comparator inmates were treated differently *and* that they were similarly situated, "mean[ing] that the individuals 'are in all relevant respects alike,'" *Stevens*, 966 F. Supp. 2d at 641; or that the different treatment resulted from discrimination. This alone is a basis for the dismissal of Claim 11.

There are also, however, troubling aspects with Pearce's factual allegations. First, there was no blatant violation of procedure. *See supra* note 19. The allegation is conclusory and unsubstantiated because the use of the overrides by Reid and Washington were not violations of procedure. Second, VDOC OP 861.1 XIII(E)(1) provides that "[i]f the outcome of the hearing is likely to affect the inmate's housing status, Security Level, or Good Time Award Level, the Hearings Officer should refer the inmate to the Institutional Classification." Pearce's conviction for refusing to work is what placed him before the ICA. Claim 11 will be dismissed.

Accordingly, it is hereby

**ORDERED** that Defendants' Motion to Dismiss (Dkt. 58) is **GRANTED**; and it is

**FURTHER ORDERED** that Defendant Reid, with respect to Claim 4, either file a motion for summary judgment or other dispositive motion within thirty (30) days of the date of this Order or file a response that expressly declines to do so.

The Clerk is directed to send a copy of this Order granting the Defendants' Motion to Dismiss (Dkt. 58) to Plaintiff and to all counsel of record.

Entered this 2 day of September, 2026.

Alexandria, Virginia