IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| TIMOTHY PEARCE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:23-cv-1251 (RDA/JFA) |
| | ) | |
| DARRELL MILLER, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

# MEMORANDUM OPINION

On April 1, 2026, the Court granted Defendants Joyce DeBerry, J.D. Oates, Darrell Miller, Chadwick Dotson, Jeremiah Fitz Jr., Cheala Washington, and Latesha Reid's Motion to Dismiss (Dkt. 45) several claims in former Virgina inmate[1] and Plaintiff Timothy Pearce's ("Plaintiff" or "Pearce") Second Amended Complaint (the "SAC"): Claims 1-3, 5-7, 9, and 12-17; the non-retaliation portion of Claim 4; and the portions of Claims 8, 10, and 11 that do not allege racial discrimination. Dkt. 54. The April 1, 2026 Order left two Defendants—Latesha Reid and Cheala Washington. *Id.* at 39. On September 2, 2026, the Court granted Defendants Reid and Washington's Third Motion to Dismiss Claims 8, 10, and 11 (Dkt. 58), which leaves the retaliation portion of Plaintiff's Claim 4 against Defendant Reid. Dkt. 64.[2] On October 9, 2026, Defendant Reid filed a Motion for Summary Judgment (Dkt. 68), along with a Memorandum in Support and Affidavit (Dkt. 69), seeking judgment in her favor on the retaliation portion of Claim 4. On

---

[1] Pearce was released by the Virginia Department of Corrections on or about June 26, 2025. Dkt. 42.

[2] The remaining portion of Claim 4 alleges that Defendant Reid retaliated against Pearce after he filed a written complaint during the second week of May 2023 when she called him "into her office [where she explained to him] that if [he] didn't withdraw [his] complaint she would not approve [his] transfer to the Work Center to be re-assigned to a different job that complied with Operating Procedure 841.2." Dkt. 19 at 9; *see* Dkt. 54 at 28 (noting that, within the context of a motion to dismiss, that portion Claim 4—which alleges that Defendant Reid attempted to coerce Pearce into withdrawing his claim, "viewed in the light most favorable to Plaintiff, state[d] a claim of retaliation for exercising his First Amendment rights").

October 14, 2026, the Court advised Plaintiff of his rights under *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), and he responded on November 10, 2026. Dkts. 76-77. The matter is now ripe for disposition and for the reasons stated herein, Defendant Reid's Motion for Summary Judgment (Dkt. 68) must be granted and this civil action Complaint must be dismissed.

**I. Standard of Review**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). As the Fourth Circuit has noted, summary judgment allows courts "to avoid useless trials where material facts are not disputed and the law points unerringly to the conclusion that one of the parties is entitled to judgment as a matter of law," *Utility Control Corp. v. Prince William Constr. Co.*, 558 F.2d 716, 719 (4th Cir. 1977), and "make[s] possible the prompt disposition of controversies on their merits without a trial, if in essence there is no real dispute as to the salient facts." *Bland v. Norfolk & S.R. Co.*, 406 F.2d 863, 866 (4th Cir. 1969).

Here, Plaintiff's Response is unsworn, and he has failed to submit statements of undisputed and disputed facts in his Response to the Defendants' Second Motion for Summary Judgment. Dkt. 77.[3]

---

[3] *See Cray Commc'ns Inc. v. Novatel Comp. Sys., Inc.*, 33 F.3d 390, 395-96 (4th Cir.1994) (noting that the district court is "well within its discretion in refusing to ferret out the facts that counsel had not bothered to excavate"); *Malina v. Baltimore Gas & Elec.*, 18 F. Supp. 2d 596, 604 (D. Md. 1998) ("[I]t is the responsibility of the plaintiff, not the court, to identify with particularity the evidentiary facts existing in the record which can oppose the defendant's summary judgment motion. The court . . . is not required to independently comb the record to look for them.") (citations omitted); *see also Weller v. Dep't of Soc. Servs.*, 901 F.2d 387, 391 (4th Cir. 1990) ("The 'special judicial solicitude' with which a district court should view such *pro se* complaints does not transform the court into an advocate.") (citing *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985)).

Plaintiff's failure to file a statement of undisputed and disputed facts renders the Defendants' facts admitted. *Gholson v. Murray*, 953 F. Supp. 709, 714 (E.D. Va. 1997) (court assumes uncontroverted facts in movant's motion for summary judgment are admitted); *see also JDS Uniphase Corp. v. Jennings*, 473 F. Supp. 2d 705, 707 (E.D. Va. 2007) (movant's statement of undisputed facts is deemed admitted where nonmovant's response fails to "identify with any specificity which facts, if any, were disputed") (citing E.D. Va. Loc. Civ. R. 56(B)).[4] Accordingly, the material undisputed facts set forth below are based upon the Defendants' Affidavit, Exhibits, other relevant sworn matters, and uncontested matters.

**II. Virginia Department of Corrections Grievance Procedures**

The Virginia Department of Corrections (the "VDOC") grievance procedures (the "VDOC OP § 866.1") are not in dispute. The relevant portions of VDOC OP § 866.1 have been summarized by numerous district courts,[5] and

---

[4] A district court does not have "'a duty to sift through the record in search of evidence to support a party's opposition to summary judgment.'" *Fallin v. Va. DOT*, 585 F. Supp. 3d 824, 832 (E.D. Va. 2022) (quoting *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992) and citing Fed. R. Civ. P. 56(c)(3) ("*The court need consider only the cited materials.*") (emphasis added))); *Skotak*, 953 F.2d at 915 n.7 (the opponent of the motion "*is required to point out the evidence, albeit evidence that is already in the record, that creates an issue of fact*") (emphasis added) (citing *Nissho-Iwai American Corp. v. Kline*, 845 F.2d 1300, 1307 (5th Cir.1988) (it is not necessary "that the entire record in the case must be searched and found bereft of a genuine issue of material fact before summary judgment may be properly entered")).

[5] The summary judgment record for Defendant Reid's Motion for Summary Judgment includes Defendant's Affidavit, which includes Pearce's Grievance Log. Dkt. 69-1. *See Nader v. Blair*, 549 F.3d 953, 963 (4th Cir. 2008) (employees "familiar with the record-keeping practices of a business are qualified to speak from personal knowledge that particular documents are admissible business records, and affidavits sworn by such employees constitute appropriate summary judgment evidence") (citing Fed. R. Evid. 803(6) and case law). Defendant's Affidavit (Dkt. 69-1) is admissible under the Business Records/Public Records exceptions at Federal Rule of Evidence 803(6), (7), (8), and (10). *See, e.g.*, *Mundo-Violante v. Kerry*, 180 F. Supp. 3d 442, 448 (W.D. Va. 2016) (admitting immigration file documents and testimony about the lack of records therein). Further, exceptions to the hearsay rule exist specifically with regard to the non-existence of records. Fed. R. Evid. 803(7) (providing that evidence that a matter is not included in a business record may be admitted as proof that the matter did not occur or exist, so long as "a record was regularly kept for a matter of that kind" and the opponent cannot show a "lack of trustworthiness"); Fed. R. Evid. 803(10) (similar to public records).

The Court's Statement of Undisputed Facts (*see infra* Section III) includes other uncontested facts to provide context related to this civil action and also includes admissions made by Pearce in his pleadings. *See Meyer v. Berkshire Life Ins. Co.*, 372 F.3d 261, 265 (4th Cir. 2004) ("a 'judicial admission,' *i.e.*, a representation that 'unless allowed by the court to be withdrawn, is conclusive in the case'" and "[a]lthough a judicial admission is not itself evidence, it has the effect of withdrawing a fact from contention") (quoting *Keller* v. *United States*, 58 F.3d 1194,

> Require[] that, before submitting a Regular Grievance, the inmate must demonstrate that he or she attempted to resolve the issue through the informal complaint process. *See id.* § 866.1.I.D.1-4. "The first step in the informal complaint process is for the offender to discuss their issue with staff for a quick resolution." *Id.* § 866.1.I.D.I. If the issue is not resolved verbally, the offender should submit a *Written Complaint*. *Id.* § 866.1.I.D.2. "The *Written Complaint* must be received by designated staff within 15 days of the original incident or discovery of the incident." *Id.* § 866.1.I.D.2.[6]
>
> Prison staff have fifteen days from receipt of the *Written Complaint* to provide an appropriate written response. *Id.* § 866.1.II.B.4. "If the issue on the *Written Complaint* is not resolved to the satisfaction of the inmate, or staff fail to provide a written response within 15 days, the inmate may file a *Regular Grievance* . . . . The *Regular Grievance* must be placed in the Grievance Mailbox within 30 days of the original incident or discovery of the incident unless a more restrictive timeframe applies." *Id.* § 866.1.II.B and III.B.5. The offender must attach any required documentation demonstrating that he attempted to resolve the issue through the Informal Complaint process; therefore, the offender must submit a copy of his *Written Complaint* or his Emergency Grievance Response with his *Regular Grievance*. *Id.* § 866.1.III.B.6.
>
> *1. Grievance Intake Procedure.*
>
> Prior to review of the substance of a grievance, prison officials conduct an "intake" review of the grievance to assure that it meets the published criteria for acceptance. *Id.* § 866.1.III.C.3-4. "If the *Regular Grievance* does not meet the intake criteria, staff has two working days from receipt to complete the *Intake* section of the

---

1199 n.8 (7th Cir. 1995)); *New Amsterdam Cas. Co. v. Waller*, 323 F.2d 20, 24 (4th Cir. 1963) (judicial admissions "go to matters of fact which, otherwise, would require evidentiary proof"); *see also Chick-Fil-A, Inc. v. Cft Dev., LLC*, 652 F. Supp. 2d 1252, 1260 (2009) ("[A]dmissions in pleadings[s] are deemed judicial admission[s], binding on the party who makes them." (quoting *Lofton v. Kearney*, 157 F. Supp. 2d 1372, 1375 n.3 (S.D. Fla. 2001) (citing *Missouri Hous. Dev. Comm'n v. Brice*, 919 F.2d 1306, 1314 (8th Cir. 1990)))); *Continental Ins. Co. of N.Y. v. Sherman*, 439 F.2d 1294, 1298 (5th Cir. 1971) ("[T]he pleading of a party made in another . . . or the same action are admissible as admissions of the pleading party to the facts alleged therein.").

[6] The VDOC grievance procedures expressly designate retaliation as a grievable issue. VDOC OP § 866.1 (III)(B)(1)(a)(iii) ("Retaliation against the offender for using the Offender Grievance Procedure"); Dkt. 69-1 at 12.

> Accessibility and Retaliation
>
> 1. Each offender is entitled to good faith use of the Offender Grievance Procedure.
>
> 2. . . . . Inmates and staff must be free from retaliation for filing verbal complaints, Written Complaints, Grievances, appeals, or utilizing any other aspect of the Offender Grievance Procedure in good faith. (changed 6/1/2022).
>
> a. An . . . inmate may pursue a complaint of retaliation through the Offender Grievance Procedure, including claims that staff are filing disciplinary offense reports in retaliation. (changed 6/1/2022).
>
> b. Allegations by staff of retaliation should be reported through their chain-of-command.

VDOC OP § 866.1 (VIII)(C); Dkt. 69-1 at 21. Retaliation is defined as "Any adverse or punitive action or threat of similar action, against anyone for use of or participation in the Offender Grievance Procedure." VDOC OP § 866.1 (Definitions); Dkt. 69-1 at 8.

*Regular Grievance* [form], indicating the reason for rejection, and to return the *Regular Grievance* to the offender." *Id.* § 866.1.III.C.5. In the Regular Grievance, an inmate is often "instructed how to remedy any problems" and can submit a new grievance correcting those deficiencies. Dkt. 69-1 ¶ 11. "If the offender disagrees with the intake decision, the offender has five days to appeal the decision." VDOC OP § 866.1.III.C.6. "There is no further review of the intake decision" and "[a]ppealing the intake decision does not satisfy the exhaustion requirement." Dkt. 69-1 ¶ 12.

*2. Grievance Review*

If the grievance is accepted, within two working days, prison "staff must print and provide the *Grievance Receipt* to the offender as notification of acceptance." VDOC OP § 866.1.III.C.4. Once the grievance is accepted for review, the Institutional Ombudsperson determines the proper course of investigation. *Id.* § 866.1.III.D.1. "Within 30 days of issuance of the *Grievance Receipt*, each accepted grievance must be investigated, reviewed, completed, and the *Offender Grievance Response–Level I* returned to the inmate unless a continuance is authorized." *Id.* § 866.1.III.F.2.b.[7]

*3. Grievance Appeals*

"The *Offender Grievance Response–Level I* includes a section for the offender to appeal their grievance response." *Id.* § 866.1.IV.A. The appeal must be submitted within five days of receipt of the *Offender Grievance Response. Id.* § 866.1.IV.B.2. "The offender must submit their appeal within five days of receiving their response to the staff member designated on the *Offender Grievance Response–Level I.*" *Id.* § 866.1.IV.B.2. Depending on the issue in the grievance, the appeal is addressed by the Director of Offender Management Services, the Health Services Director, the Superintendent for Education, the Chief of Corrections Operations, or the Regional Administrator. *See id.* § 866.1.IV.C.1.a-e. . . . the Level II appeal is the final level of review. Dkt. 69-1 ¶ 13.

---

[7] The procedure to appeal an intake decision is set forth in VDOC OP § 866.1.III.D. *See* Dkt. 69-1 at 18. Inmate Appeal of an Intake Decision (changed 6/1/2022):

> a. If an offender wishes to appeal the intake decision on their grievance, the offender must submit the original Regular Grievance 866 Fl to the Regional Ombudsman at the address posted on each housing unit's bulletin board within five days of receipt of the returned grievance.
>
> b. The Regional Ombudsman must make a determination to either uphold or overturn the intake decision and must provide a disposition within five days of receipt.
>
> c. The Regional Ombudsman must maintain a copy of all Regular Grievances received that appeal the intake decision with their determination to uphold or overturn documented.
>
> d. There is no further review or appeal of an intake decision following a Regional Ombudsman disposition. (added 6/1/2022).

> "The exhaustion requirement is met only when a *Regular Grievance* has been accepted into the grievance process and appealed, without satisfactory resolution of the issue." *Id.* § 866.1.V.B.

*Brown v. Green*, Civil Action No. 3:24-cv-228, 2026 WL 2271412, at *3-4 (E.D. Va. Aug. 6, 2026).[8] Each informal complaint and regular grievance is numbered, and informal complaints include "INF" as part of their number and regular grievances include "REG."

### III. Undisputed Statement of Facts

1. At all times relevant to this action, Pearce was a prisoner detained in the VDOC, housed at the Deerfield Correctional Center (the "DCC"). Dkt. 19 at 4.[9]

2. At all times relevant to this action, Defendant Latesha Reid ("Reid") was a DCC Unit Manager. Dkt. 69 at 2.

3. In May 2021, Pearce was transferred to the Bland Correctional Facility ("Bland") and assigned an "outside" job. Dkt. 19 at 6.

4. On March 24, 2023, Pearce was transferred to the Patrick Henry Correctional Center, a Level 1 Security facility, and was asked to fill out a "job application" to work at the "farm." Dkt. 1 at 6; Dkt. 19 at 7. Approximately "3½ weeks" later, without being interviewed for the job, he was transferred to DCC, a Level 2 facility, and "forced into a Security Level 2 job assignment [Flash Freeze]." Dkt. 19 at 7.

5. Pearce's first day at Flash Freeze was May 2, 2023. Dkt. 15 at 10. On May 6, 2023, Pearce filed a Written Complaint, DCC-23-INF-01046, complaining that he had not been assigned to "outside work." Dkt. 16 at 98. Citing VDOC OP § 841.2, Peace argued that a Security

---

[8] The citations have been verified with Defendant's affidavit. Dkt. 69-1 at 6-22 (copy of VDOC OP § 866.1, revised effective date February 1, 2021, amended June 1 and August 1, 2022; also amended April 23, 2024). The first two amendments occurred before the relevant period of Claim 4 (April 2023 through June 2023), and the last amendment occurred well after the relevant period of Claim 4.

[9] Pearce was transferred to the Baskerville Correctional Center (the "BCC") on or about November 15, 2023 (Dkt. 16 at 2) and was released by the VDOC on or about June 26, 2025 (Dkt. 42).

Level 1 inmate such as himself was eligible for outside work assignments and that he "must be assigned to the appropriate work classification in accordance with Operating Procedure 425.1." *Id.*

*Plaintiff's Grievance Submissions*

6. During April through June 2023, the relevant period for Claim 4, Pearce filed nine Informal Complaints (also referred to as written complaints) and two Regular Grievances.[10] The eleven documents are summarized below:

- DCC-23-INF-01488, received on 6/29/2023, Pearce alleged that "the Deerfield Inmate Handbook says all of its programs are governed by OP 841.2 Work Programs, but on May 25 you had two refusal to work charges dismissed in violation of OP 841.2 'under no circumstances will an offender be placed in a work assignment that jeopardizes their safety or security or the safety or security of others and you feel you have been immediately dismissed.'" Response on 5/30/2023 by L. Reid, UM—"The Hearing Officer responds states [that] she informed you that you must continue to go to work unless you are being held in for M[e]dical or until m[e]dical releases you from work[]. At this time[,] you have not been released from work and you should continue to report to work[]. The [dismissal of the] charges . . . does not mean you don't report to work[]." Sent to Pearce on 7/7/2023.
- DCC-23-INF-01444, received on 6/26/2023, Pearce alleged that "the cable channels are constantly going out. Response on 6/28/2023 by J. DeBerry, G.C.—"Buford Satellite is aware of the issues and is working to find a solution." Sent to Pearce on 7/7/2023.
- DCC-23-INF-01207, received on 5/26/2023, Pearce alleged that "according to OP 841.2, Work Programs [he] should not be working at Flash Freeze because [he was] a level 1 inmate." Response on 5/30/2023 by L. Reid, UM—"Per policy the Director of Corrections through CCS has the authority to assign any inmate to any

[10] Pearce's SAC states that Defendant Reid's alleged conduct (the retaliation portion of Claim 4) occurred in May 2023 (Dkt. 19 at 8), the relevant time period. A grievance must be filed within 30 days after it occurred. The grievances and informal complaints Pearce filed while he was in the VDOC are attached to Defendant's affidavit as Encloser B. Dkt. 69-1 at 23-51. Enclosure B is "Pearce's Grievance Report from February 11, 2021, through August 28, 2024. A grievance Report is a VDOC document that logs all Written Complaints [and] Regular Grievances that were accepted at intake[] and appeals to Level I and Level II of Regular Grievances that have been filed by an inmate. However, a Grievance Report does not reflect Regular Grievances that were rejected at intake." *Id.* ¶ 16. The first entry is on March 18, 2021, while Pearce was at the Nottoway Correctional Center, and the last entry was on May 29, 2024, while Pearce was at Buckingham Correctional Center. The written complaints and grievances listed herein are from April 2023 when Pearce arrived at DCC through the end of June 2023, which would include written complaints filed in April 2023 and the subsequent regular grievance, if any. The grievance log indicates that Pearce filed twenty written complaints and two regular grievances at Nottoway and Buckingham Correctional Centers before he was transferred to DCC. *Id.* at 44-51. The grievance log also does not indicate any written complaints, or regular grievances were filed during the month of July 2023.

institution deemed appropriate to facilitate effective bed management and main orderly operations with an ICA hearing." Sent to Pearce on 6/2/2023. Dkt. 16 at 86.

- DCC-23-INF-01063, received on 5/9/2023, Pearce alleged that under "841.2 Work Programs states [that] when necessary (the work P.A.R.) consulting with Mental Health staff to determine if offenders are suitable for the vacant job based on certain factors." Inmate T. Pierce 136277 voluntarily withdrew this complaint on 5/11/2023. Witnessed by L. Reid, Unit Manager. Sent to Pearce on 5/19/2023.

- DCC-23-INF-01064, received on 5/9/2023, Pearce alleged that under "841.2 Work Programs: Under no circumstances will offenders be placed in a job assignment that jeopardizes their safety or security or the safety and security of others and you feel that every day you are forced to work in that environment." Inmate T. Pierce 136277 voluntarily withdrew this complaint on 5/11/2023. Witnessed by L. Reid, Unit Manager. Sent to Pearce on 5/19/2023.

- DCC-23-INF-01046, received on 5/8/2023, Pearce alleged that "OP 841.2 Work Programs under section B, Part 2 it states, Security level w.1.s offenders eligible for an outside work assignment must be assigned to the appropriate work classification in accordance with OP 425.1."[11] Response on 5/9/2023 by L. Reid, UM—"Per policy the Unit Head or designee based on the institutional mission and offen[d]er population will determine the number of outside work crews and the work classification of each outside work crews to be established[]; Operating Procedure 425.1." Pearce was "entered for a transfer[12] and SLW at [his] annual in April 2022." Sent to Pearce on 5/19/2023.

- DCC-23-REG-00086, received on 5/2/2023, Pearce alleged that he did not volunteer and was "being forced . . . to work a job that is designed and meant for Level 2 inmates[,] and [he] are sure VA Code is being violated by [him] being here. Pearce's Level I appeal denied relief. Level II Response: Pearce's "grievance [was] governed by Operating Procedure, 830.5, Transfers, Institution Reassignments. Field Units and Work Centers are minimum security institutions designed to provide suitable confinement for lower risk offenders, increase productivity of offenders through work activity, and provide a cost effective alternative to more traditional prison construction[]. Offenders who meet the eligibility criteria may

[11] It appears that Pearce is referring to VDOC OP § 841.2.II.B.2 ("Ensure each inmate's work classification is accurate and recorded in VACORIS, prior to determining an inmate's work assignment; *see* Operating Procedure 425.1, Outside Work Assignments.") in this Informal Complaint.

[12] Operating Procedure 830.5, Transfers, Institution Reassignments, states that "Field Units and Work Centers are minimum security institutions designed to provide suitable confinement for lower risk inmates, increase productivity of inmates through work activity, and provide a cost-effective alternative to more traditional institution construction." VDOC OP § 830.5(IV)(A). "SLW" is an acronym for Security Level W, and the SLW designation means an inmate has not been convicted of "Murder I, Sex Offense, Kidnap/Abduction, No Escapes within the last 10 years as defined in the Institutional Assignment Criteria, No Flight/Failure to Appear Pattern, No Felony Detainers. Felony convictions for Murder II, Voluntary Manslaughter, Robbery with Weapon Present or Implied, Malicious Wounding, Unlawful Wounding, Maiming, and Felonious Assault, including multiple convictions," which are "considered on a case-by-case basis," and can be determined at the [i]nitial and reclassification 7 years or less, and no 100 series charges in the last six months." VDOC OP § 830.5(IV)(D)(1).

request a transfer to a Field Unit or Work Center at the time of their annual review[] or may be administratively reviewed and assigned by CCS staff upon a determination that such an assignment is appropriate. Based on the information provided, the Level II respondent upheld] the decision of the Level I respondent, which has determined that [Pearce's] grievance was Unfounded. Level II is the last level of appeal for this grievance. You have exhausted all administrative remedies." Sent to Pearce on 6/7/2023.

- DCC-23-REG-00087, received on 5/2/2023, Pearce alleged that he was being "housed with 80+ level 2 inmates you are being denied the Green dot level 1 that you earned because you are coded as a Level "W"." Level II Response: "In [his] grievance, [he] allege[d] that [he was] forced to sign a blank application with the threat of a writeup and loss of Good Time if [he] refused. All [of his] freedoms [he had] earned [would be] taken. [He would] not get any of the benefits of being in a Level I facility, nor [would he] get any of the benefits of working a Level I Green Dot job. [Pearce] contend [he met] all the requirements to have [his] security level lowered to a W. An investigation into [his] claims did not reveal evidence to overturn the ruling of the Level I respondent. [Pearce's] current Security Level is 1; however, [he was] recommended for security level W during [his] review which, [was] pending approval. This grievance is governed by Operating Procedure, 830.2, Security Level Classification[]. Security Level classification decisions involve the assessment of each case based on a determination of eligibility, suitability, and acceptability. Based on the information provided, [the Level II respondent upheld] the decision of the Level I respondent, which . . . determined that [his] grievance was Unfounded. Level II is the last level of appeal for this grievance. You have exhausted all administrative remedies." Sent to Pearce on 6/7/2023.

- DCC-23-INF-00955, received on 4/26/2023, alleged that when Pearce "came to DFCC [he was] issued no T-Shirts (Size L), one pair socks, one towel and one wash cloth and [he had] nothing to wear. [Pearce] state[d] [he] ha[d] no boots, the shoes [were] two sizes too big and no jacket. [Begin Addendum] "Inmate T. Pearce voluntarily withdrew this written complaint on 5/2/2023 and it was witnessed by T. Artis, Captain."

- DCC-23-INF-00917, received on 4/24/2023, alleged that "at Deerfield [Pearce was being] housed with 80+ level 2 inmates [and he was] being denied the Green dot level 1 that [he had] earned because [he was] coded as a Level 'W.'"[13] Response on 4/26/2023 by S. Hardy, IPM—Pearce was "currently a Security Level 1 []. During your annual, you can be reviewed to see if you meet the requirements of a SL "W"[]. You were selected to participate in Flash Freeze.

- DCC-23-INF-00918, received on 4/24/2023, alleged that Pearce was "being forced . . . to work a job that is designed and meant for Level 2 inmates and" he was "sure VA Code is being violated by [him] being [at DCC]." Response on 4/26/2023 by S. Hardy, IPM—Pearce was "selected to transfer to Deerfield to participate in Flash

[13] Level W designation stands for "Work Center." VDOC OP § 830.2 (1)(C).

Freeze. If [he] desire[d] to change jobs, [he could] submit a job application for any openings that are available." [Pearce was] currently a SL 1 and qualif[ied]for class IV-work criteria according to policy 425.1–Outside Work Assignments."

7. On June 4, 2023, Pearce requested to be seen by Mental Health. On June 5, 2023, Senior Mental Health Clinician Wrenn saw Pearce. Wrenn's progress notes indicate Pearce told her that his disciplinary charges had been dropped, and that "DCC's Warden said if [his] charges were dropped, he would approve my transfer . . . I can't sleep. I just can't work[] in that Flash Freeze inside all day with people around me . . . I'm a level one inmate. I should be at a work camp." Dkt. 19-1 at 5. Wrenn noted that his appearance, behavior, and speech were within normal limits; his thought processes were linear and logical; thought content was normal; no perceptual disturbances or hallucinations; he was alert; oriented to time, place, situation, and person; his memory was fine; and he was above average intelligence. Dkt. 16 at 11.

8. Pearce indicated to Wrenn "that he [had] not experienced significant mental health symptoms since 2018 when he was treated for depression in jail," and "that, if he were removed from Flash Freeze and transferred to a level one facility, he would not need mental health services." *Id.* Wrenn concluded that "Pearce [was] attempting to have Mental Health staff ensure his removal from Flash Freeze without being charged and transferred to a higher-level facility." *Id.*[14] No indication in the progress notes that Pearce alleged that Defendant Reid threated to retaliate against him unless he withdrew a complaint.[15]

[14] Wrenn also advised Pearce "that, if his mental health status interferes with his ability to work in Flash Freeze, he will be removed from his job but will likely remain in a level 2 facility where mental health staff are on site for a period of time until he meets criteria to transfer back to a work center." *Id.* at 11-12.

[15] On June 6, 2023, Plaintiff met with Assistant Warden Oates and discussed a letter Pearce wrote to Warden Miller. Pearce discussed this meeting with Wrenn. Pearce states that Oates explained to him that he had been classified as Medical Code A and Mental Health Code 0, and that he "should go to work like everyone else." Dkt. 15 at 17. No indication Pearce alleged to Oates that Defendant Reid had threatened to retaliate against him unless he withdrew a complaint.

9. On June 28, 2023, Pearce filed an informal complaint, DCC-23-INF-01488, arguing that since two earlier charges had been dismissed, based upon VDOC OP 841.2, that he should have been dismissed from Flash Freeze. Dkt. 16 at 54. On June 30, 2023, Defendant Reid responded and noted that the hearing officer had informed him that he "must continue to go to work unless you are being held in medical or until medical releases [him] from work. At this time, you have not been released from work[,] and you should continue to report to work. The charges being dismissed does not mean you don't report to work." *Id.*

10. On June 22, 2023, Pearce was charged with "Lying or Giving False Information." Dkt. 15 at 19; VDOC OP § 861.1, Inmate Discipline, Category II Code of Offenses (Code 206, Lying or Giving False Information to an Employee). The charge for "Lying or Giving False Information" was "written by Counselor Bradshaw" who claimed that Pearce "lied about why [he] didn't want to go to work." Dkt. 15 at 19. The same hearing officer that had dismissed the two refusing to work charges from May 2023 found him guilty of the lying/false information charge on June 29, 2023. *Id.* at 20.

**III. Discussion**

Defendant Reid argues that her Motion for Summary Judgment should be granted because Pearce did not exhaust his administrative remedies before filing this civil action, with respect to his retaliation allegation in Claim 4, as required by the Prison Litigation Reform Act (the "PLRA"). Further, Defendant Reid notes that Pearce was able to fully utilize the grievance process during the applicable time period. Dkt. 69 at 5-7.[16] Pearce's unsworn Response argues that

---

[16] "Although the Fourth Circuit has not yet considered this question, other circuits of the Court of Appeals have held that the administrative exhaustion requirement under the PLRA continues to apply when a prisoner is released while his lawsuit still is pending in federal court." *Chase v. Peay*, 286 F. Supp. 2d 523, 527 (D. Md. 2003) (collecting cases), *aff'd*, 98 F. App'x 253 (4th Cir. 2004) (the court found "no error" and "affirm[ed] on the reasoning of the district court"). This is consistent with the plain language of the PLRA, which focuses on the time that a lawsuit is "brought" in federal court. *Id.* at 528; *see Cox v. Mayer*, 332 F.3d 422, 425 (6th Cir. 2003) ("Because (1) plaintiff was a prisoner when he 'brought' his suit, and (2) plaintiff's suit implicates 'prison conditions,' § 1997e(a) applies and plaintiff was required to exhaust any available administrative remedies before he filed suit.") (citing 42 U.S.C.

> [t]here was no way I was going to file a written complaint and grievance against defendant Reid when she had already threatened me. My transfer would never be approved. After the false refusing to work charges were filed against me, the 15 day time limit was up for me to file a written complaint to start the grievance process. There was nothing I could do.

Dkt. 77 at 1.[17] Pearce's unsworn Response is not part of the summary judgment record. The summary judgment record establishes that Pearce did not exhaust the VDOC's administrative remedies with regard to the retaliation portion of Claim 4, and Defendant Reid's Motion for Summary Judgment will be granted.

*A. PLRA*

In relevant part, the PLRA provides that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983] or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Because the exhaustion of administrative remedies is an affirmative defense, a defendant bears the burden of proving lack of exhaustion. *See Jones v. Bock*, 549 U.S. 199, 212, 216 (2007); *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008). Nevertheless, "exhaustion in cases covered by § 1997e(a) is mandatory," and district courts have no discretion to waive this requirement. *Pearce v. Nussle*, 534 U.S. 516, 524 (2002).

Under the PLRA, exhaustion "requires proper exhaustion," *Woodford v. Ngo*, 548 U.S. 81, 93 (2006), meaning that the plaintiff must "us[e] all steps that the agency holds out, and do[] so properly (so that the agency addresses the issues on the merits)." *Id.* at 90 (quoting *Pozo v.*

---

§ 1997e(a)).

[17] *See Walker v. Tyler County Comm'n*, 11 Fed. App'x 270, 274 (4th Cir. 2001) ("When a motion for summary judgment is made and supported [by affidavits], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, [but must respond with] affidavits [that] set forth specific facts showing that there is a genuine issue for trial.") (citing Fed. R. Civ. P. 56(e)); *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991) (recognizing the general rule that "when one party files a motion for summary judgment, the nonmovant cannot merely rely on matters pleaded in the complaint, but must, by factual affidavit or the like, respond to the motion").

*McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)). In so holding, *Woodford* reasoned that "proper exhaustion" enhances "the quality of those prisoner suits that are eventually filed," for, "[w]hen a grievance is filed shortly after the event giving rise to the grievance, witnesses can be identified and questioned while memories are still fresh, and evidence can be gathered and preserved." *Id.* at 95. Thus, "proper exhaustion" requires "compliance with *an agency's deadlines and other critical procedural rules* because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Id.* at 90-91 (emphasis added). These "critical procedural rules" specifically include grievance timing requirements; otherwise, "a prisoner wishing to bypass available administrative remedies could simply file a late grievance without providing any reason for failing to file on time," and, following rejection of the grievance as untimely, "proceed directly to federal court." *Id.* at 95; *see id.* at 83-84 (an "untimely or otherwise procedurally defective administrative grievance" does not satisfy the PLRA's exhaustion requirement).[18] The PLRA was not intended to "create such a toothless scheme." *Id.*

Lastly, the PLRA's exhaustion-prior-to-filing requirement is "mandatory" and the language of the PLRA is "unambiguous." *Ross v. Blake*, 578 U.S. 632, 638 (2016). "An inmate 'shall' bring no action (or said more conversationally, may not bring any action) 'absent exhaustion of available administrative remedies.'" *Id.* (quoting *Woodford*, 548 U.S. at 85) (additional citations omitted). The requirement that a prisoner exhaust before filing "allow[s] a prison to address complaints about the program it administers before being subjected to suit, reduc[es]

[18] The PLRA requires that an inmate "must 'complete the administrative review process in accordance with the applicable procedural rules.'" *Jones*, 549 U.S. at 218 (quoting *Woodford*, 548 U.S. at 88). Those rules "are defined not by the PLRA, but by the prison grievance process itself," and thus "it is the prison's requirements . . . that define the boundaries of proper exhaustion." *Id.* Accordingly, the VDOC's Grievance Procedure establishes the applicable rules for Plaintiff to properly exhaust his § 1983 claims prior to bringing suit. VDOC OP § 866.1.IV.O.1. Pursuant to the Grievance Procedure, Plaintiff was required to (i) file a Regular Grievance that was accepted for intake, and then (ii) appeal that Regular Grievance through all eligible levels of review without satisfactory resolution, before raising those claims in court. VDOC OP § 866.1.IV.O.2.b. If the grievance was rejected at intake, Pearce was required to pursue his appeal to the Regional Ombudsman.

litigation to the extent complaints are satisfactorily resolved, and improv[es] litigation that does occur by leading to the preparation of a useful record." *Pearce*, 534 U.S. at 519.[19]

Defendant Reid argues that the alleged retaliation portion of Claim 4 is not exhausted. Her argument is supported by an Affidavit, the Grievance Log, and the summary judgment record. Pearce, as the nonmovant, cannot simply submit a conclusory unsworn statement. Instead, Pearce's failure results in the movant's asserted fact being admitted. *See Integrated Direct Marketing, LLC v. May*, 129 F. Supp. 3d 336, 345 (E.D. Va. 2015). Pearce's failure is significant at this juncture of the litigation because he has not properly denied the relevant and essential point upon which Defendant Reid's Motion for Summary Judgment is predicated by admissible evidence because his Response is not sworn. Plaintiff's failure to follow the VDOC's policy regarding the submission of grievances on the retaliation portion of Claim 4 raised renders his claim against Defendant Reid unexhausted, and her Motion for Summary Judgment will be granted.[20]

---

[19] Exhaustion is required even if the administrative remedies do not meet federal standards, are not "plain, speedy, and effective," and even if the relief sought is not available via the grievance process, such as monetary damages. *Pearce*, 534 U.S. at 524. To properly exhaust, thereby giving the agency a full and fair opportunity to adjudicate a plaintiff's claims, the plaintiff must adhere to the agency's deadlines and procedural rules. *Woodford*, 548 U.S. at 89-90.

[20] *See, e.g.*, *Green v. Rubenstein*, 644 F. Supp. 2d 723, 746 (S.D. W.V. 2009) (while plaintiff exhausted administrative remedies with respect to his Eighth Amendment deliberate indifference claim, "[i]t is not evident that Plaintiff complained [that the delay in treatment was] in retaliation for his filing of a lawsuit against the Defendants. Plaintiff has therefore not exhausted administrative remedies with respect to this claim"); *Dorsey v. Shearin*, 2018 WL 1570246, at *6 (D. Md. Mar. 30, 2018) (granting defendant's motion for summary judgment because "the record demonstrates that there is no dispute of material fact that [Plaintiff] failed to present and exhaust through all levels of the administrative process his claim that he was placed in Maximum II security in retaliation for filing a grievance about the availability of Native American services"), *aff'd*, 737 F. App'x 176 (4th Cir. 2018). *See also Adams v. Sw. Va. Reg'l Jail*, Civil Action No. 7:12-cv-462, 2014 WL 3828392, at *3 (W.D. Va. Aug. 4, 2014) (an inmate does not exhaust the grievance process if he fails to file an appeal in accordance with jail policy and procedure), *aff'd sub nom. Adams v. Ofought*, 592 F. App'x 225 (4th Cir. 2015).

*B. Plaintiff's Response*

To the extent Pearce is arguing that the grievance process was unavailable, he is wrong. *Ross* held that courts "may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement" and that "[t]he only limit to §1997e(a)'s mandate is the one baked into its text: An inmate need exhaust only such administrative remedies as are 'available.'" 578 U.S. at 648. Although Pearce does not cite *Ross*, the Court finds that the three exceptions in *Ross* do not apply. *Id.* at 643-45. First, the grievance process was available to Pearce. He filed numerous grievances during the relevant time period, filed grievances before and after the relevant time period, and he even met with VDOC officials, including Defendant Reid's superior, Assistant Warden Oates. Second, the grievance procedure is straightforward and expressly provides that claims for retaliation are grievable. Lastly, there is no evidence that the VDOC personnel prevented Pearce from using the grievance procedure or from filing an appeal. *See Gibson v. Weber*, 431 F.3d 339, 341 (8th Cir. 2005) ("Appellants have presented no evidence that any prison official thwarted an attempt to initiate the procedures or that any official made it impossible for them to file grievances."). To be sure, the Seventh Circuit held that "when the prisoner causes the unavailability of the grievance process by simply not filing a grievance in a timely manner, the process is not unavailable but rather forfeited." *Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006).[21] Pearce's conduct constitutes forfeiting his administrative remedy.

---

[21] *Cornell v. Jones*, Civil Action No. 3:23-cv-489, 2026 U.S. Dist. LEXIS 192927, at *30 (E.D. Va. 2026) ("Although the normal remedy for a failure to exhaust under § 1997e(a) is dismissal without prejudice, *see, e.g.*, *Booth*, 532 U.S. at 735, dismissal with prejudice may be appropriate 'where exhaustion was required but administrative remedies have become unavailable after the prisoner had ample opportunity to use them and no special circumstances justified failure to exhaust.'") (quoting *Berry v. Kerik*, 366 F.3d 85, 88 (2d Cir. 2004)); *see Van Houten v. Marlett*, 330 F. App'x 161, 162-63 (10th Cir. 2009). That is the case here, because the 30-day time limit for filing any relevant grievance has long since expired.

Pearce filed several informal complaints and grievances before, during, and after the relevant time period. The alleged threat did not deter Pearce from going over Defendant Reid's head to Warden Miller and Assistant Warden Oates, and Pearce also met with the mental health counselor and discussed his concerns about Flash Freeze. Pearce also submitted an unauthenticated regular grievance dated May 22, 2023, which is close in time to the retaliation allegation, in which he sought a transfer. Dkt. 16 at 98.

Pearce attached one example of him forfeiting an administrative remedy involving Defendant Reid in May 2023. The informal complaint, DCC-23-INF-01046 (*see supra* at 6, 8), that accompanied the grievance was dated May 6, 2023; received by Defendant Reid on May 8, 2023; and Defendant Reid responded to the informal complaint on May 9, 2023. Pearce attempted to file a regular grievance, which stated the incident occurred on April 20, 2023. The regular grievance did not allege retaliation and was rejected at intake for being filed more than 30 days after the incident. *Id.* Pearce did not appeal the intake decision.[22] It is evident that Pearce was not prevented by Defendant Reid or anyone else from using the VDOC's grievance process. Pearce's failure to file timely with regard to DCC-23-INF-01046 resulted in Pearce forfeiting an available remedy in May 2023, and he has produced "no evidence that any prison official thwarted

---

[22] *See Oliver v. Va. Dep't of Corrs.*, Civil Action No. 3:09-cv-56, 2010 WL 1417833, at *6-7 (W.D. Va. Apr. 6, 2010) (holding that plaintiff who failed to appeal grievance intake decision to VDOC Regional Ombudsman failed to exhaust remedies as required by the PLRA); *see also Davis v. Stanford*, 382 F. Supp. 2d 814, 818 (E.D. Va. 2004) (Virginia inmates are required to exhaust claims in accordance with the grievance procedures established by the VDOC), *aff'd*, 127 F. App'x 680 (affirming "for the reasons stated by the district court"); *see, e.g.*, *Jackson v. Collins*, Civil Action No. 7:24-cv-00147, 2026 WL 264286, at *4 (W.D. Va. Feb. 2, 2026) (where a regular grievance is "rejected at intake as being untimely filed, and [the plaintiff] did not appeal the intake decision," the plaintiff "did not exhaust his administrative remedies" and the defendant has "made a threshold showing of failure to exhaust," and "the burden of showing that administrative remedies were unavailable falls to the plaintiff") (citing *Draper v. Ohai*, Civil Action No. 7:23-cv-248, 2025 WL 270051, at *5 (W.D. Va. Jan. 22, 2025) (citing *Graham v. Gentry*, 413 F. App'x 660, 663 (4th Cir. 2011))); *Jackson v. Barksdale*, Civil Action No. 7:17-cv-31, 2017 WL 3446259, at *5 (W.D. Va. Aug. 10, 2017) (district court found that plaintiff had failed to exhaust his claim because plaintiff's "grievance regarding confiscation and disposal of [his] property was not timely filed, [and] he could not, thereafter, file a proper regular grievance that would have been accepted at intake"), *aff'd*, 707 F. App'x 786 (4th Cir. 2018).

an attempt to initiate the procedures or that any official made it impossible for them to file grievances." *Gibson*, 431 F.3d at 341.

**IV. Conclusion**

For the reasons outlined above, Defendant Reid's Motion for Summary Judgment (Dkt. 68) must be granted. An appropriate Order and Judgment shall issue alongside this Memorandum Opinion.

IT IS SO ORDERED.

Alexandria, Virginia
November 20, 2026

/s/

**Rossie D. Alston, Jr.**
**United States District Judge**